VICTORIA DOWLING *v.* SOL V. SLOTNIK ET AL.
(SC 15711)

Callahan, C. J., and Norcott, Katz, Palmer and McDonald, Js.

Argued January 16—officially released May 26, 1998

*Sol V. Slotnik*, pro se, and, on the brief, *Diane Reverand*, pro se, the appellants (named respondent et al.).

*Brenden P. Leydon*, for the appellee (claimant).

*Opinion*

CALLAHAN, C. J. The principal issue in this appeal is whether a claim for a work-related injury by the claimant, an illegal alien, is within the jurisdictional confines of the Workers' Compensation Act, General Statutes § 31-275 et seq. We conclude that it is.

The following facts and procedural history are uncontroverted. On February 14, 1994, the respondents, Sol V. Slotnik and Diane Reverand,[1] who are husband and wife, hired the claimant, Victoria Dowling, as a live-in housekeeper and nanny for their two sons. At that time, the claimant informed the respondents that she was an illegal alien. She also exaggerated her prior work experience on her application for employment. In return for her services, the respondents agreed to pay the claimant a gross weekly salary of $400 and provide her with health insurance, room and board, use of an automobile and an allowance toward the cost of a private telephone. The respondents did not obtain workers' compensation insurance coverage for the claimant, as required by General Statutes (Rev. to 1993) § 31-284,[2] or provide the agreed upon health insurance coverage.

---

[1] The second injury fund was named as a respondent in the proceedings before the workers' compensation commissioner but did not participate in this appeal. References to the respondents are to Slotnik and Reverand.

[2] General Statutes (Rev. to 1993) § 31-284 (a) provides in relevant part: "An employer shall not be liable to any action for damages on account of

On February 28, 1994, while going to the respondents' mailbox, which was located at the end of their driveway, the claimant slipped and fell on ice that had accumulated in the driveway, seriously injuring her right arm and hand. The claimant thereafter brought a timely claim for workers' compensation benefits.[3] The workers' compensation commissioner for the fourth district (commissioner) determined that, despite her status as an illegal alien, the claimant was an "employee" as defined by General Statutes § 31-275 (9),[4] and that her claim consequently was within the jurisdiction of the workers' compensation commission (commission). The commissioner found that the fall had caused the claimant to suffer right brachial plexopathy and reflex sympathetic dystrophy as well as right ulnar neuropathy. The commissioner also found that the claimant's injuries had arisen out of and during the course of her employment and, therefore, were compensable pursuant to § 31-284 (a). The commissioner further found that those

---

personal injury sustained by an employee arising out of and in the course of his employment . . . but an employer shall secure compensation for his employees as provided under this chapter . . . ." Section 31-284 (a) was revised in 1996. We refer herein to the statute as revised to 1993.

[3] See General Statutes § 31-294c.

[4] General Statutes § 31-275 (9) (A) provides in relevant part: " 'Employee' means any person who:

"(i) Has entered into or works under any contract of service . . . with an employer . . . ."

General Statutes § 31-275 (9) (B) provides in relevant part: " 'Employee' shall not be construed to include:

"(i) Any person to whom articles . . . are given to be treated . . . on premises not under the control . . . of the person who gave them out;

"(ii) One whose employment is of a casual nature and who is employed otherwise than for the purposes of the employer's trade or business;

"(iii) A member of the employer's family dwelling in his house . . .

"(iv) Any person engaged in any type of service in or about a private dwelling provided he is not regularly employed by the owner or occupier over twenty-six hours per week;

"(v) An employee of a corporation who is a corporate officer and who elects to be excluded . . . or

"(vi) Any person who is not a resident of this state but is injured in this state during the course of his employment, unless . . . ."

injuries had caused the claimant to be totally disabled between June 24, 1994, and August 30, 1995, and that the compensation rate applicable to her claim was $325.25 per week.[5] The commissioner ordered the respondents to pay: (1) $20,125.22 in disability benefits for the period from June 24, 1994, through August 30, 1995; (2) disability benefits for the period from August 31, 1995, forward, subject to further medical documentation of the claimant's disability; (3) interest on past due disability benefits at the rate of 12 percent per annum and the claimant's attorney's fee;[6] (4) a $10,000 fine to the second injury fund for failing to secure compensation coverage for the claimant as required by § 31-284;[7] (5) any reasonable medical expenses incurred by the claimant as a result of the fall;[8] and (6) the claimant's testimonial expenses.[9]

The respondents appealed from the order of the commissioner to the compensation review board (board) pursuant to General Statutes § 31-301.[10] The board

[5] General Statutes § 31-307 (a) provides in relevant part: "If any injury for which compensation is provided under the provisions of this chapter results in total incapacity to work, the injured employee shall be paid a weekly compensation equal to seventy-five per cent of his average weekly earnings as of the date of the injury . . . but the compensation shall not be more than the maximum weekly benefit rate . . . for the year in which the injury occurred. No employee entitled to compensation under this section shall receive less than twenty per cent of the maximum weekly compensation rate . . . provided the minimum payment shall not exceed seventy-five per cent of the employee's average weekly wage . . . and the compensation shall not continue longer than the period of total incapacity."

[6] General Statutes § 31-300 provides in relevant part: "In cases where, through the fault or neglect of the employer . . . payments have been unduly delayed, the commissioner may include in his award . . . interest at twelve per cent per annum and a reasonable attorney's fee. . . ."

[7] General Statutes (Rev. to 1995) § 31-288 (c) provides in relevant part: "Whenever the commissioner finds that the employer is not in compliance with said requirements he may assess a civil penalty of not more than ten thousand dollars against the employer. . . ."

[8] See General Statutes § 31-294d.

[9] See General Statutes § 31-298.

[10] General Statutes § 31-301 (a) provides in relevant part: "At any time within ten days after entry of an award by the commissioner, after a decision

affirmed the commissioner's order. Acting pro se, Slotnik appealed from the decision of the board to the Appellate Court pursuant to General Statutes § 31-301b.[11] The claimant subsequently filed a motion in the Appellate Court seeking dismissal of Reverand's appeal for her failure to file properly. The Appellate Court issued an order granting the claimant's motion to dismiss Reverand's appeal unless a corrected appeal was filed on or before May 29, 1997. On May 28, 1997, both respondents, acting pro se, filed a corrected appeal. We transferred the corrected appeal to this court pursuant to Practice Book § 4023, now Practice Book (1998 Rev.) § 65-1, and General Statutes § 51-199 (c).

On appeal, the respondents claim that the commissioner improperly determined that the claimant had sustained a compensable injury. Specifically, the respondents argue that: (1) the commission's authority was preempted, under the circumstances of this case, by the federal Immigration Reform and Control Act of 1986;[12] (2) the commission lacked jurisdiction over the claimant's claim because illegal aliens are not included in the group of "persons" eligible for workers' compensation benefits; (3) the commission lacked jurisdiction over the claimant's claim because the employment agreement between the claimant and the respondents, having been tainted by the illegality of the claimant's immigration status, does not constitute a "contract of

---

of the commissioner upon a motion or after an order by the commissioner according to the provisions of section 31-299b, either party may appeal therefrom to the Compensation Review Board by filing in the office of the commissioner from which the award or the decision on a motion originated an appeal petition and five copies thereof. . . ."

[11] General Statutes § 31-301b provides: "Any party aggrieved by the decision of the Compensation Review Board upon any question or questions of law arising in the proceedings may appeal the decision of the Compensation Review Board to the Appellate Court."

[12] The Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, 100 Stat. 3359 (1986), amended the Immigration and Nationality Act, which is codified as amended at 8 U.S.C. § 1101 et seq.

service," and, consequently, the claimant is not an "employee" as defined in § 31-275 (9); (4) the commission lacked jurisdiction over the claimant's claim because the employment agreement between the claimant and the respondents was invalidated by misrepresentations the claimant made in her employment application and, therefore, does not constitute the requisite "contract of service," and, consequently, the claimant is not an "employee" as defined in § 31-275 (9); and (5) the commissioner's order is violative of the respondents' due process and equal protection rights under the United States and Connecticut constitutions. The respondents further claim that the commissioner abused his discretion by ordering the respondents to pay a $10,000 fine to the second injury fund for failing to procure workers' compensation coverage for the claimant.

## I

Before reviewing the merits of the respondents' claims, we address a challenge raised in the claimant's brief to our jurisdiction over Reverand's appeal. The claimant argues that Reverand's appeal is not properly before this court because the Appellate Court lacked authority to permit the respondents to file a corrected appeal. In effect, the claimant contends that the Appellate Court lacked authority to allow Reverand to file a late appeal. We disagree.

"We note at the onset that . . . a claim that this court lacks subject matter jurisdiction [may be raised] at any time. Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy presented by the action before it. . . . The objection of want of [subject matter] jurisdiction may be made at any time . . . and the court or tribunal may act on its own motion, and should do so when the lack of

jurisdiction is called to its attention. . . . The requirement of subject matter jurisdiction cannot be waived by any party and can be raised at any stage in the proceedings. . . . If at any point, it becomes apparent to the court that such jurisdiction is lacking, the appeal must be dismissed." (Internal quotation marks omitted.) *State* v. *Anonymous*, 240 Conn. 708, 718, 694 A.2d 766 (1997); see *Lewis* v. *Gaming Policy Board*, 224 Conn. 693, 698–99, 620 A.2d 780 (1993); *Statewide Grievance Committee* v. *Rozbicki*, 211 Conn. 232, 245, 558 A.2d 986 (1989); *State* v. *Malkowski*, 189 Conn. 101, 104, 454 A.2d 275 (1983).

Section 31-301b authorizes a party aggrieved by a final decision of the board to appeal from the board's decision to the Appellate Court. See *Cleveland* v. *U.S. Printing Ink, Inc.*, 218 Conn. 181, 184–85, 588 A.2d 194 (1991). Practice Book § 4165, now Practice Book (1998 Rev.) § 76-1, provides in relevant part that "[t]he practice and procedure for appeals to the appellate court (1) from a decision of the compensation review board . . . shall conform to the rules of practice governing other appeals." Practice Book § 4009 (a), now Practice Book (1998 Rev.) § 63-1 (a), provides in relevant part that "a party shall have twenty days from the [date notice is given of the board's decision] . . . to file an appeal . . . ." It is undisputed that Reverand's appeal was not filed properly until after the twenty day limit established by § 4009 (a) had expired. The twenty day time limitation established by § 4009 (a), however, is not a " 'constitutionally or legislatively created condition precedent to the jurisdiction of [the appellate] court.' " *Ambroise* v. *William Raveis Real Estate, Inc.*, 226 Conn. 757, 763, 628 A.2d 1303 (1993); see *Kelley* v. *Bonney*, 221 Conn. 549, 558–59, 606 A.2d 693 (1992); *Connelly* v. *Doe*, 213 Conn. 66, 69–70 n.5, 566 A.2d 426 (1989). Furthermore, Practice Book § 4183, now Practice Book (1998 Rev.) § 60-2, explicitly provides that

"the court having appellate jurisdiction from the time the appeal is filed, or earlier . . . may, on its own motion . . . (6) order that a party for good cause shown may file a late appeal . . . ." We eschew "mechanistic interpretation[s] of our appellate rules in recognition of the fact that an unyielding policy requiring strict adherence to an appellate limitation period—no matter how severe or unfair the consequences—does not serve the interests of justice." *Banks* v. *Thomas*, 241 Conn. 569, 586, 698 A.2d 268 (1997). Practice Book § 4183 (6) vested the Appellate Court with authority to permit Reverand to pursue a late appeal, and, consequently, her appeal is properly before this court.

## II

We turn now to the respondents' substantive claims. We note that ordinarily we would not address the respondents' claim that the commission's authority to award workers' compensation benefits to the claimant was preempted by the federal Immigration Reform and Control Act of 1986 (Immigration Reform Act) until after the respondents' remaining jurisdictional claims had been resolved, because if the commission lacked jurisdiction over the claimant's claim for benefits, we would not need to consider the respondents' federal preemption claim. Because, however, the respondents' jurisdictional claims are inextricably intertwined with the Immigration Reform Act, we depart, for purposes of clarity, from our usual practice and first discuss the respondents' preemption claim.

We begin with a brief overview of the purpose and relevant provisions of the Immigration Reform Act. "The [Immigration Reform Act] constituted a major . . . response to the vast tide of illegal immigration that had produced a 'shadow population' of literally millions of undocumented aliens in the United States." *McNary* v. *Haitian Refugee Center, Inc.*, 498 U.S. 479,

481, 111 S. Ct. 888, 112 L. Ed. 2d 1005 (1991); see *Etuk* v. *Slattery*, 936 F.2d 1433, 1437 (2d Cir. 1991). The Immigration Reform Act sought to reduce the flow of illegal immigration into the United States by removing the employment "magnet" that draws undocumented aliens into the country. *Montero* v. *Immigration & Naturalization Service*, 124 F.3d 381, 384 (2d Cir. 1997); see H.R. Rep. No. 99-682(I), 99th Cong., 2d Sess. 45–46, 56 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5649–50, 5660. The goal of the Immigration Reform Act was "to reduce the incentives for employers to hire illegal aliens." *National Labor Relations Board* v. *A.P.R.A. Fuel Oil Buyers Group, Inc.*, 134 F.3d 50, 55 (2d Cir. 1997); see *Patel* v. *Quality Inn South*, 846 F.2d 700, 704 (11th Cir. 1988), cert. denied, 489 U.S. 1011, 109 S. Ct. 1120, 103 L. Ed. 2d 182 (1989) (Immigration Reform Act was designed to eliminate economic incentive to hire undocumented aliens); accord *Equal Employment Opportunity Commission* v. *Tortilleria "La Mejor,"* 758 F. Supp. 585, 591 (E.D. Cal. 1991).

Consistent with these goals, the Immigration Reform Act makes it unlawful knowingly to employ unauthorized workers. 8 U.S.C. § 1324a (a). Employers are required to verify that each of their employees is authorized to work in the United States and to complete an employment eligibility verification form, attesting that the employer has examined certain types of documents and has verified that the potential employee is not an unauthorized alien. 8 U.S.C. § 1324a (b). Civil fines may be imposed on an employer who violates the verification requirements or knowingly employs an unauthorized alien. 8 U.S.C. § 1324a (e) (4) and (5). A pattern or practice of knowingly employing unauthorized aliens may result in the infliction of criminal punishment. 8 U.S.C. § 1324a (f). In addition, the Immigration Reform Act provides that *"[t]he provisions of [§ 1324a] preempt any State or local law imposing civil or criminal*

*sanctions . . . upon those who employ . . . unau-thorized aliens."* (Emphasis added.) 8 U.S.C. § 1324a (h) (2).

"The question of preemption is one of federal law, arising under the supremacy clause of the United States constitution. . . . Determining whether Congress has exercised its power to preempt state law is a question of legislative intent." (Citation omitted.) *Serrano* v. *Serrano*, 213 Conn. 1, 5, 566 A.2d 413 (1989); see *Northwest Central Pipeline Corp.* v. *State Corp. Commission of Kansas*, 489 U.S. 493, 509, 109 S. Ct. 1262, 103 L. Ed. 2d 509 (1989). Preemption may be express or implied. *Assn. of International Automobile Manufacturers, Inc.* v. *Abrams*, 84 F.3d 602, 607 (2d Cir. 1996). "Express preemption occurs to the extent that a federal statute expressly directs that state law be ousted to some degree from a certain field. . . . Even where there is no express statutory statement ousting state law from a given area, [however] there may be implied preemption." Id. "The United States Supreme Court has instructed us that, absent an explicit statement that Congress intends to preempt state law, courts should infer such intent where Congress has legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law, *Rice* v. *Santa Fe Elevator Corp.*, 331 U.S. 218, 67 S. Ct. 1146, 91 L. Ed. 1447 (1947), or where the state law at issue conflicts with federal law, either because it is impossible to comply with both, *Florida Lime & Avocado Growers, Inc.* v. *Paul*, 373 U.S. 132, 142–43, 83 S. Ct. 1210, 1217–18, 10 L. Ed. 2d 248 [reh. denied, 374 U.S. 858, 83 S. Ct. 1861, 10 L. Ed. 2d 1082] (1963), or because the state law stands as an obstacle to the accomplishment and execution of congressional objectives, *Hines* v. *Davidowitz*, 312 U.S. 52, 67, 61 S. Ct. 399, 404, 85 L. Ed. 581 (1941)." (Internal quotation marks omitted.) *Serrano* v. *Serrano*, supra, 6; see *Northwest Central*

*Pipeline Corp.* v. *State Corp. Commission of Kansas*, supra, 509.

The respondents make two arguments in support of their claim that the Immigration Reform Act preempted the commissioner from awarding workers' compensation benefits to the claimant. They argue that to the extent that a workers' compensation award requires an employer to make payments to an undocumented alien, the award constitutes a civil sanction against the employer that is expressly preempted by 8 U.S.C. § 1324a (h) (2), the preemption provision of the Immigration Reform Act, and, in the alternative, that such an award impliedly is preempted by the Immigration Reform Act because providing workers' compensation benefits to an undocumented alien contravenes the purpose of the Immigration Reform Act. We disagree with both claims.

## A

We turn first to the respondents' claim that the Immigration Reform Act expressly preempts the commissioner from awarding workers' compensation benefits to undocumented aliens. Section 1324a (h) (2), the express preemption provision of the Immigration Reform Act, only prohibits the states from imposing civil *sanctions* upon those who employ undocumented aliens. Because workers' compensation benefits are designed " 'to *compensate the worker for injuries* arising out of and in the course of employment, *without regard to fault,* by imposing a form of strict liability on the employer' "; (emphasis added) *Panaro* v. *Electrolux Corp.*, 208 Conn. 589, 598–99, 545 A.2d 1086 (1988); *Jett* v. *Dunlap,* 179 Conn. 215, 217, 425 A.2d 1263 (1979); an award of such benefits reasonably cannot be described as a "sanction."

Moreover, even if we assume, arguendo, that workers' compensation benefits somehow do constitute a

"sanction" rather than a compensatory remedy, the respondents' argument that § 1324a (h) (2) proscribes awards of workers' compensation benefits to illegal aliens is still unpersuasive. Section 1324a (h) (2) does not preempt the states from imposing any civil sanction *whatsoever* upon a person who employs an undocumented alien. Rather, the Immigration Reform Act expressly preempts the states from sanctioning an employer only *for employing an undocumented alien.* To construe the express preemption provision of the Immigration Reform Act otherwise would result in state and local officials being unable to impose even a traffic fine upon a person who has employed an undocumented alien, an obviously absurd result. Accordingly, in order for an award of compensation benefits to an undocumented alien to fall within the purview of § 1324a (h) (2), the benefits must have been awarded *because the employee was an illegal alien.* The respondents, however, do not contend that the legislature intended that an award of workers' compensation benefits serve as a means of penalizing employers *for employing undocumented aliens,* nor do they claim that the commissioner awarded benefits to the claimant in order to sanction the respondents *for hiring the claimant,* and nothing in the record even suggests that was the case. We conclude, therefore, that the commissioner's award of workers' compensation benefits to the claimant does not constitute a civil sanction that is preempted by § 1324a (h), the express preemption provision of the Immigration Reform Act.

## B

The respondents also maintain that to the extent that the Workers' Compensation Act authorizes the commissioner to award benefits to undocumented aliens, the Workers' Compensation Act *impliedly* is preempted

by the Immigration Reform Act.[13] "[A] federal statute implicitly overrides state law either when the scope of a statute indicates that Congress intended federal law to occupy a field exclusively . . . or when state law is in actual conflict with federal law. [The United States Supreme Court has] found implied conflict pre-emption where it is impossible for a private party to comply with both state and federal requirements . . . or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." (Citations omitted; internal quotation marks omitted.) *Freightliner Corp.* v. *Myrick*, 514 U.S. 280, 287, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995); *Silkwood* v. *Kerr-McGee Corp.*, 464 U.S. 238, 248, 104 S. Ct. 615, 78 L. Ed. 2d 443 (1984); *Kenny* v. *Kenny*, 226 Conn. 219, 224, 627 A.2d 426 (1993); *Times Mirror Co.* v. *Division of Public Utility Control*, 192 Conn. 506, 510–11, 473 A.2d 768 (1984). The respondents do not claim that the Immigration Reform Act was intended to "occupy [the] field" or that it is impossible for employers to comply with the requirements of both the Immigration Reform Act and the Workers' Compensation Act, but argue instead that providing workers' compensation benefits to an undocumented alien would contravene the purpose of the Immigration Reform Act. "[T]here is a strong presumption against federal pre-emption of state and local legislation." *Richmond Boro Gun Club, Inc.* v. *New York*, 97 F.3d 681, 687 (2d Cir. 1996); see *California* v. *ARC America Corp.*, 490 U.S. 93, 101, 109 S. Ct. 1661, 104 L. Ed. 2d 86 (1989). This presumption is especially strong in areas traditionally occupied by the states, such as public health and safety.

---

[13] The inclusion in a federal statute of an express provision regarding preemption does not necessarily foreclose the possibility that aspects of a state law not expressly within the federal preemption provision may be preempted by implication. *Freightliner Corp.* v. *Myrick*, 514 U.S. 280, 287–88, 115 S. Ct. 1483, 131 L. Ed. 2d 385 (1995); *Assn. of International Automobile Manufacturers, Inc.* v. *Abrams*, supra, 84 F.3d 607.

*Richmond Boro Gun Club, Inc.* v. *New York,* supra, 687; see *English* v. *General Electric Co.,* 496 U.S. 72, 79, 110 S. Ct. 2270, 110 L. Ed. 2d 65 (1990). Consideration of issues arising under the supremacy clause " 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by . . . Federal Act unless that [is] the *clear and manifest* purpose of Congress.' " (Emphasis added.) *Medtronic, Inc.* v. *Lohr,* 518 U.S. 470, 485, 116 S. Ct. 2240, 135 L. Ed. 2d 700 (1996); *New York State Conference of Blue Cross &Blue Shield Plans* v. *Travelers Ins. Co.,* 514 U.S. 645, 655, 115 S. Ct. 1671, 131 L. Ed. 2d 695 (1995); *Rice* v. *Santa Fe Elevator Corp.,* supra, 331 U.S. 230.

The primary purpose of the Immigration Reform Act was to establish procedures that make it more difficult to employ undocumented workers and to punish employers who knowingly offer jobs to those workers. *National Labor Relations Board* v. *A.P.R.A. Fuel Oil Buyers Group, Inc.,* supra, 134 F.3d 55–56; see *United States* v. *Todd Corp.,* 900 F.2d 164, 165 (9th Cir. 1990). The Immigration Reform Act itself gives no indication that Congress intended the act to preempt state laws whenever state laws operate to benefit undocumented aliens. Indeed, "it is clear from [the] legislative history [of the Immigration Reform Act] that Congress anticipated some conflict between the new statute and . . . various state . . . statutes . . . . As explained in the House Report: 'It is not the intention of the Committee that the employer sanctions provisions of the bill be used to undermine or diminish in any way labor protections in existing law . . . .' " *Montero* v. *Immigration & Naturalization Service,* supra, 124 F.3d 384; see H.R. Rep. No. 99-682(I), p. 58 (1986), reprinted in 1986 U.S.C.C.A.N. 5649, 5662. "[I]n an effort not to exacerbate the appeal of illegal workers to unscrupulous employers, [the Immigration Reform Act] . . . does not

reduce the legal protections and *remedies* for undocumented workers under other laws." (Emphasis added.) *National Labor Relations Board* v. *A.P.R.A. Fuel Oil Buyers Group, Inc.*, supra, 56.

Furthermore, there is no merit to the respondents' argument that providing workers' compensation benefits to undocumented aliens would stand as an obstacle to "removing the employment 'magnet' that draws undocumented aliens into the country." *Montero* v. *Immigration & Naturalization Service*, supra, 124 F.3d 384. Potential eligibility for workers' compensation benefits in the event of a work-related injury realistically cannot be described as an incentive for undocumented aliens to enter this country illegally. See *Patel* v. *Quality Inn South*, supra, 846 F.2d 704 (procurement of employment at any wage, not prospect of job-related protections, attracts illegal immigrants). More important, excluding such workers from the pool of eligible employees would relieve employers from the obligation of obtaining workers' compensation coverage for such employees and thereby contravene the purpose of the Immigration Reform Act by creating a financial incentive for unscrupulous employers to hire undocumented workers. See Conn. Joint Standing Committee Hearings, Judiciary, 1913 Sess., p. 124, remarks of Professor Willard C. Fisher ("[u]nless the employer is required to pay the same [insurance premium for all workers] . . . he is . . . under inducement to take on [uncovered workers] . . . [the Workers' Compensation Act] must not . . . exclude aliens from the benefits; because there would be precisely the same inducement under such a provision for an employer to take on the men who are not citizens of the country"); *Mendoza* v. *Monmouth Recycling Corp.*, 288 N.J. Super. 240, 247, 672 A.2d 221 (1996) ("immunity from accountability [under Workers' Compensation Act] might well have the further undesirable effect of encouraging employers to hire illegal

aliens in contravention of the provisions and policies [of the Immigration Reform Act]"); *Montoya* v. *Gateway Ins. Co.*, 168 N.J. Super. 100, 104, 401 A.2d 1102 (1979) (potential employers may be encouraged to employ illegal aliens if such aliens are unable to lodge claims based on injuries sustained); see also *Sure-Tan, Inc.* v. *National Labor Relations Board*, 467 U.S. 883, 893, 104 S. Ct. 2803, 81 L. Ed. 2d 732 (1984) (excluding illegal aliens from purview of National Labor Relations Act would provide incentive for employers to hire such workers); *Patel* v. *Quality Inn South*, supra, 846 F.2d 704 (excluding illegal aliens from purview of Fair Labor Standards Act would provide incentive for employers to hire such workers).

The respondents have failed to establish that Congress intended the Immigration Reform Act to preempt state laws that benefit undocumented aliens, nor have they demonstrated that including undocumented aliens in the pool of employees potentially eligible to receive state workers' compensation benefits would result in "clear and manifest" damage; *Medtronic, Inc.* v. *Lohr*, supra, 518 U.S. 485; to the goal Congress sought to attain when it enacted the Immigration Reform Act. We conclude, therefore, that the Immigration Reform Act does not preempt, either expressly or impliedly, the authority of the states to award workers' compensation benefits to undocumented aliens.

III

We begin our analysis of the respondents' jurisdictional claims by setting forth the standard of review applicable to workers' compensation appeals. "The principles that govern our standard of review in workers' compensation appeals are well established. 'The conclusions drawn by [the commissioner] from the facts found must stand unless they result from an incorrect application of the law to the subordinate facts or

from an inference illegally or unreasonably drawn from them.' . . . *Besade* v. *Interstate Security Services*, 212 Conn. 441, 449, 562 A.2d 1086 (1989). Neither the review board nor this court has the power to retry the facts. See *Six* v. *Thomas O'Connor & Co.*, 235 Conn. 790, 798–99, 669 A.2d 1214 (1996)." *Doe* v. *Stamford*, 241 Conn. 692, 696–97, 699 A.2d 52 (1997). "It is well established that [a]lthough not dispositive, we accord great weight to the construction given to the workers' compensation statutes by the commissioner and review board. . . . A state agency is not entitled, however, to special deference when its determination of a question of law has not previously been subject to judicial scrutiny." (Internal quotation marks omitted.) *Duni* v. *United Technologies Corp.*, 239 Conn. 19, 24–25, 682 A.2d 99 (1996); *Davis* v. *Norwich*, 232 Conn. 311, 317, 654 A.2d 1221 (1995). "Where . . . [a workers' compensation] appeal involves an issue of statutory construction that has not yet been subjected to judicial scrutiny, this court has plenary power to review the administrative decision." *Doe* v. *Stamford*, supra, 697; see *Davis* v. *Norwich*, supra, 317.

In determining that the claimant's claim for workers' compensation benefits was within the jurisdiction of the commission, the commissioner relied on the board's determination in *Tavares* v. *Noel*, 15 Conn. Workers' Comp. Rev. Op. 172, 174 (1996), that illegal aliens are included in the group of persons eligible for workers' compensation benefits. The claimant maintains that we must accord great deference to the board's determination in *Tavares* that illegal aliens are eligible for workers' compensation benefits. Neither that issue nor any of the other issues raised in the respondents' jurisdictional challenges, however, has been subjected previously to judicial scrutiny, and, consequently, our review of the respondents' jurisdictional claims is plenary.

A brief overview of the purpose, relevant provisions and relevant jurisdictional confines of the Workers' Compensation Act is necessary to a resolution of the respondents' jurisdictional claims. " 'The purpose of the workmen's compensation statute is to compensate the worker for injuries arising out of and in the course of employment, without regard to fault, by imposing a form of strict liability on the employer.' " *Panaro* v. *Electrolux Corp.*, supra, 208 Conn. 598–99; *Jett* v. *Dunlap*, supra, 179 Conn. 217. The Workers' Compensation Act " 'compromise[s] an employee's right to a common law tort action for work related injuries in return for relatively quick and certain compensation.' " *Panaro* v. *Electrolux Corp.*, supra, 599; see *Hunnihan* v. *Mattatuck Mfg. Co.*, 243 Conn. 438, 446, 705 A.2d 1012 (1997); *Dodd* v. *Middlesex Mutual Assurance Co.*, 242 Conn. 375, 381, 698 A.2d 859 (1997); *Mingachos* v. *CBS, Inc.*, 196 Conn. 91, 97, 491 A.2d 368 (1985).

"We have previously observed that the workers' compensation commission, like any administrative body, must act strictly within its statutory authority . . . . It cannot modify, abridge, or otherwise change the statutory provisions under which it acquires authority unless the statutes expressly grant it that power." (Internal quotation marks omitted.) *Discuillo* v. *Stone & Webster*, 242 Conn. 570, 576, 698 A.2d 873 (1997); see *Figueroa* v. *C & S Ball Bearing*, 237 Conn. 1, 4, 675 A.2d 845 (1996); *Castro* v. *Viera*, 207 Conn. 420, 428, 541 A.2d 1216 (1988). "A commissioner may exercise jurisdiction to hear a claim only 'under the precise circumstances and in the manner particularly prescribed by the enabling legislation.' " *Discuillo* v. *Stone & Webster*, supra, 576; *Heiser* v. *Morgan Guaranty Trust Co.*, 150 Conn. 563, 565, 192 A.2d 44 (1963). "[I]t is settled law that the commissioner's jurisdiction is confined by the [Workers' Compensation Act] and limited by its provisions." (Internal quotation marks omitted.) *Discuillo* v.

*Stone & Webster,* supra, 576; *Gagnon* v. *United Aircraft Corp.,* 159 Conn. 302, 305, 268 A.2d 660 (1970). "The commissioner exercises jurisdiction only under the precise circumstances and in the manner particularly prescribed by the enabling legislation." (Internal quotation marks omitted.) *Kinney* v. *State,* 213 Conn. 54, 60, 566 A.2d 670 (1989); *Heiser* v. *Morgan Guaranty Trust Co.,* supra, 565; *Castro* v. *Viera,* supra, 427–28. "The parties cannot confer jurisdiction upon the commissioner by agreement, waiver or conduct." *Kinney* v. *State,* supra, 60; *Castro* v. *Viera,* supra, 429–30. "The [Workers' Compensation Act] is not triggered by a claimant until he brings himself within its statutory ambit." (Internal quotation marks omitted.) *Kinney* v. *State,* supra, 59; *Castro* v. *Viera,* supra, 433. "Although the Workers' Compensation Act 'should be broadly construed to accomplish its humanitarian purpose'; *Adzima* v. *UAC/Norden Division,* 177 Conn. 107, 117, 411 A.2d 924 (1979); *Perille* v. *Raybestos-Manhattan-Europe, Inc.,* 196 Conn. 529, 541, 494 A.2d 555 (1985); its remedial purpose cannot transcend its statutorily defined jurisdictional boundaries." *Kinney* v. *State,* supra, 58–59; *Castro* v. *Viera,* supra, 145.

"The entire statutory scheme of the Workers' Compensation Act is directed toward those who are in the employer-employee relationship as those terms are defined in the act and discussed in our cases. That relationship is threshold to the rights and benefits under the act; a claimant . . . who is not an employee has no right under this statute to claim for and be awarded benefits." (Internal quotation marks omitted.) *Vanzant* v. *Hall,* 219 Conn. 674, 678, 594 A.2d 967 (1991); *Castro* v. *Viera,* supra, 207 Conn. 433. "[A claimant] may invoke the remedy provided under the Workers' Compensation Act only if [the claimant], as a matter of law, satisfies the requisite jurisdictional standard of 'employee' as

defined by the legislature in [§ 31-275 (9)]." *Kinney* v. *State,* supra, 213 Conn. 60.

The respondents maintain that, as a matter of law, the claimant does not meet the jurisdictional standard of being an "employee" as defined in § 31-275 (9) because: (1) illegal aliens are not included in the group of "persons" eligible, by virtue of the definition of "employee" in § 31-275 (9) (A) (i), to invoke the remedy provided by the Workers' Compensation Act; (2) the employment agreement between the claimant and the respondents, having been tainted by the claimant's immigration status, does not constitute a "contract of service" as is required under § 31-275 (9) (A) (i) to establish the employer-employee relationship; and (3) the employment agreement between the claimant and the respondents, having been invalidated by misrepresentations the claimant made on her employment application, does not constitute the "contract of service" required by § 31-275 (9) (A) (i) to establish the employer-employee relationship. We disagree with all three claims.

A

The respondents first maintain that illegal aliens are not included in the group of "persons" who, by virtue of the definition of "employee" under § 31-275 (9) (A) (i), are eligible for workers' compensation benefits. The respondents have called our attention to the public policy implications of this issue, but the question is really a matter of statutory construction. In interpreting statutes, we are guided by "well established tenets [of statutory construction] . . . . [O]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In seeking to discern that intent, we look to the words of the statute itself, to the legislative history and circumstances surrounding its enactment, to the legislative policy it was designed to

implement, and to its relationship to existing legislation and common law principles governing the same general subject matter." (Internal quotation marks omitted.) *Gil* v. *Courthouse One*, 239 Conn. 676, 682, 687 A.2d 146 (1997); see *Metropolitan District Commission* v. *AFSCME, Council 4, Local 184*, 237 Conn. 114, 120, 676 A.2d 825 (1996); *M. DeMatteo Construction Co.* v. *New London*, 236 Conn. 710, 714–15, 674 A.2d 845 (1996); *State* v. *Burns*, 236 Conn. 18, 22–23, 670 A.2d 851 (1996); *State* v. *Spears*, 234 Conn. 78, 86–87, 662 A.2d 80, cert. denied, 516 U.S. 1009, 116 S. Ct. 565, 133 L. Ed. 2d 490 (1995).

Our analysis begins with the language of § 31-275 (9). Section 31-275 (9) (A) (i) defines "employee" in relevant part as *"any person* who . . . [h]as entered into or works under *any contract of service* . . . with an employer . . . ." (Emphasis added.) As is often the case in the context of workers' compensation legislation; see *Duni* v. *United Technologies Corp.*, supra, 239 Conn. 25; *Dos Santos* v. *F. D. Rich Construction Co.*, 233 Conn. 14, 20, 658 A.2d 83 (1995); the statutory language provides no *express* guidance as to whether the legislature intended to include illegal aliens in the group of "persons" for whom the Workers' Compensation Act provides the exclusive means of obtaining compensation for work-related injuries. The legislature's use of the term *"any* person"; (emphasis added); rather than *"a* person," however, strongly suggests an intent to include all workers, rather than only workers legally present in this country, within the group of persons able to invoke the remedy provided by the Workers' Compensation Act. Moreover, the fact that § 31-275 (9) (B) expressly excludes certain persons, but not illegal aliens, from the definition of "employee" also suggests that the legislature did not intend to exclude illegal aliens from the purview of § 31-275 (9). "[U]nless there

is evidence to the contrary, statutory itemization indicates that the legislature intended the list to be exclusive." (Internal quotation marks omitted.) *Zachs* v. *Groppo*, 207 Conn. 683, 692–93, 542 A.2d 1145 (1988); see also *B. F. Goodrich Co.* v. *Dubno*, 196 Conn. 1, 6, 490 A.2d 991 (1985); *State* v. *Kish*, 186 Conn. 757, 766, 443 A.2d 1274 (1982); accord *Sure-Tan, Inc.* v. *National Labor Relations Board*, supra, 467 U.S. 892 ("[s]ince undocumented aliens are not among the few groups of workers expressly exempted by Congress, they plainly come within the broad statutory definition of 'employee'" contained in National Labor Relations Act); *Patel* v. *Quality Inn South*, supra, 846 F.2d 702 (broad definition of "employee" followed by specific exceptions strongly suggests Congressional intent to include all workers not specifically excepted within purview of Fair Labor Standards Act).

A brief review of the legislative genealogy of § 31-275 (9) (A) (i) is informative in discerning the legislative intent with regard to illegal aliens. The Workers' Compensation Act has been a part of our law since 1913. See Public Acts 1913, c. 138; see also *Bouley* v. *Norwich*, 222 Conn. 744, 751, 610 A.2d 1245 (1992); A. Grillo, "Fifty Years of Workmen's Compensation—An Historical Review," 38 Conn. B.J. 239, 246 (1964). When enacted in 1913, it defined "employee" as meaning "any person who has entered into or works under any contract of service or apprenticeship with an employer. . . ." Public Acts 1913, c. 138, pt. B, § 43. Although the Workers' Compensation Act subsequently has been amended to exclude certain persons from the operative definition of "employee"; see General Statutes § 31-275 (9) (B); and to bring certain public employees who do not work under a "contract of service" within the purview of the act; see General Statutes § 31-275 (9) (A) (iii) through (vi); the operative definition of "employee"

has remained unchanged since 1913. See General Statutes § 31-275 (9) (A) (i).

We turn next to the legislative history of chapter 138 of the 1913 Public Acts. "It is now well settled that testimony before legislative committees may be considered in determining the particular problem or issue that the legislature sought to address by the legislation. . . . This is because legislation is a purposive act . . . and, therefore, identifying the particular problem that the legislature sought to resolve helps to identify the purpose or purposes for which the legislature used the language in question." (Citations omitted.) *United Illuminating Co.* v. *New Haven*, 240 Conn. 422, 450, 692 A.2d 742 (1997); see *State* v. *Ledbetter*, 240 Conn. 317, 337, 692 A.2d 713 (1997); *Frillici* v. *Westport*, 231 Conn. 418, 430–31 n.15, 650 A.2d 557 (1994); *State* v. *Magnano*, 204 Conn. 259, 273–74 n.8, 528 A.2d 760 (1987). During the committee hearings on the bill that ultimately became chapter 138 of the 1913 Public Acts, Professor Willard C. Fisher, an economist from Wesleyan University who had been engaged by the standing committees on judiciary and labor to assist in drafting the Workers' Compensation Act; A. Grillo, supra, 38 Conn. B.J. 244–45; remarked that "[u]nless the employer is required to pay the same [insurance premium for all workers] . . . he is . . . under inducement to take on [uncovered workers] . . . [the Workers' Compensation Act] must not . . . exclude aliens from the benefits; because there would be precisely the same inducement under such a provision for an employer to take on the men who are not citizens of the country." Conn. Joint Standing Committee Hearings, supra, p. 124. He further stated that "the [proposed] bill is open to serious criticism . . . [and] you must not allow . . . discrimination between aliens and residents and citizens. . . . Connecticut cannot afford to discriminate against the employment of her own citizens . . . ." Id.,

pp. 226–27. In light of the legislature's explicit consideration of whether aliens should be excluded from the purview of the Workers' Compensation Act, the fact that, when ultimately adopted, chapter 138 of the 1913 Public Acts did not contain a provision excluding aliens from the statutory scheme is clear evidence that the legislature intended aliens to come within the statutory definition of an employee as "*any person* who . . . enters into or works under *any contract of service* . . . ." (Emphasis added.) General Statutes § 31-275 (9) (A) (i); see Public Acts 1913, c. 138, pt. B, § 43.

Furthermore, we previously have stated that the Workers' Compensation Act "applies to *every natural or artificial person who enters upon a contract of employment*"; (emphasis added) *Douthwright* v. *Champlin*, 91 Conn. 524, 528, 100 A. 97 (1917); and "includes *every alien* of any nationality." (Emphasis added.) *Frasca* v. *City Coal Co.*, 97 Conn. 212, 214, 116 A. 189 (1922). "[The] language [of the Workers' Compensation Act] is not that of restriction or limitation, but all-embracing. . . . [I]t applies to '*all contracts* of employment,' and this was intended to mean . . . by *whomsoever made*. . . . It defines an employer and an employee as 'any person.' *It excepts certain classes, and the designation of these exceptions marks the only limitation upon the definition.*" (Emphasis added.) *Douthwright* v. *Champlin*, supra, 527.

There is nothing in the language or legislative history of § 31-275 (9) (A) (i) to indicate that the legislature intended to include legal aliens but exclude illegal aliens from the purview of the Workers' Compensation Act, and the rationale for not excluding aliens from the group of "persons" potentially able to invoke the remedy provided by the act applies with equal force to both legal and illegal aliens. Moreover, at the time § 31-275 (9) (A) (i) was enacted, it was not unlawful for an employer

to hire an undocumented alien, nor was it a criminal offense for an alien to accept employment after entering this country illegally. See *Sure-Tan, Inc. v. National Labor Relations Board,* supra, 467 U.S. 893. Consequently, there is no evidence to suggest that the legislature, having intended to include aliens within the purview of the Workers' Compensation Act, did not also intend an employment agreement between an employer and a worker who is an illegal alien to constitute a "contract of service" within the meaning of the act. We conclude, therefore, that the legislature intended to include illegal aliens in the group of "persons" who, in order to obtain compensation for work-related injuries, are not only eligible, but also required, to invoke the remedy provided by the Workers' Compensation Act and that the legislature intended employment agreements between illegal aliens and their employers to constitute "contract[s] of service" as is required by § 31-275 (9) (A) (i) to establish the employer-employee relationship.

B

The respondents nevertheless maintain that even if illegal aliens come within the definition of "employee" provided by the Workers' Compensation Act, the employment agreement between the claimant and the respondents, having been tainted by illegality as a result of the claimant's immigration status and the respondents' actions in knowingly employing an undocumented alien, does not constitute a "contract of service" as is required by § 31-275 (9) (A) (i). Specifically, the respondents reason that: (1) the employment agreement between the respondents and the claimant is an "illegal" contract; (2) such contracts are "null and void"; and (3) consequently, there was no "contract" and, therefore, no "contract of service" between the claimant and the respondents. Although we agree with

the respondents that "under the [Workers' Compensation A]ct . . . coverage must arise from a contract of employment, either express or implied"; *Blancato* v. *Feldspar Corp.*, 203 Conn. 34, 38, 522 A.2d 1235 (1987); *Sibley* v. *State*, 89 Conn. 682, 686–87, 96 A. 161 (1915); we do not agree that an employment agreement between an employer and an illegal alien is so tainted by illegality that, as a matter of law, the agreement cannot constitute a "contract of service" within the meaning of § 31-275 (9) (A) (i).

In dictum in *Kenez* v. *Novelty Compact Leather Co.*, 111 Conn. 229, 234–35, 149 A. 679 (1930), the only case in which this court previously has considered what impact, if any, a taint of illegality in an employment agreement has upon a worker's status as an employee under § 31-275 (9) (A) (i), we discussed, but did not apply to the employment agreement at issue, the common-law doctrine against judicial enforcement of "illegal" contracts. Accordingly, a brief overview of that doctrine is helpful before we turn to the merits of the respondents' claim.

As a general rule, a "court will [not] lend its assistance in any way toward carrying out the terms of a contract, the *inherent purpose* of which is to violate the law . . . but if both parties are in pari delicto, the law will leave them where it finds them." (Emphasis added.) *Tator* v. *Valden*, 124 Conn. 96, 101, 198 A. 169 (1938); see *Connecticut Importing Co.* v. *Janowitz*, 128 Conn. 433, 436, 23 A.2d 514 (1941); *Vaszauskas* v. *Vaszauskas*, 115 Conn. 418, 423, 161 A. 856 (1932). "It is not for [a defendant's] sake however that the objection [to enforcement of the contract] is ever allowed, but [the court's refusal to enforce the contract] is *founded in general principles of policy* [of] which the defendant has the advantage . . . ." (Emphasis added; internal quotation marks omitted.) *Funk* v. *Gallivan*, 49 Conn. 124, 128 (1881); see *Beit* v. *Beit*, 135 Conn. 195, 199–200,

63 A.2d 161 (1948); see also *Vaszauskas* v. *Vaszauskas,*
supra, 424 (" 'principle of public policy . . . leads
courts to refuse to act' "). Thus, it is in order to effectu-
ate an underlying public policy, rather than to sanction
a party seeking to enforce an "illegal" contract, that
courts refuse to lend assistance to those who have con-
tributed to the illegality that taints the contract.

In *Kenez* v. *Novelty Compact Leather Co.,* supra, 111
Conn. 229, as in the present case, the taint of illegality
did not arise by virtue of a contractual provision that
required the employee to engage in an unlawful activity.
Instead, it arose in connection with a child labor statute,
which, like the Immigration Reform Act, had not been
enacted at the time the Workers' Compensation Act
was adopted and which, like the Immigration Reform
Act, prohibited the making of certain employment
agreements.[14] Id., 234–35. Seeking to avoid liability
under the Workers' Compensation Act, the employer
maintained that the employment agreement at issue in
*Kenez* did not constitute a "contract of service" because
the "legislature must . . . have intended . . . to
include only legal contracts and therefore it cannot
have intended to include one made in violation of [the
child labor] statute." Id., 234. The court determined that
construing the employment agreement to constitute a
"contract of service" under the Workers' Compensation
Act would accord with both the language and legislative
intent of the Workers' Compensation Act. Id., 236–37.
The court noted that, with respect to the violation of
the child labor law, the parties were not in pari delicto
and that the common-law doctrine against judicial
enforcement of "illegal" contracts might preclude a

---

[14] In order to secure employment, the plaintiff in *Kenez,* who was a minor,
misrepresented his age. The defendant employer failed to comply with a
statute requiring employers to obtain a certificate attesting to a minor's
eligibility, under criteria set forth in the statute, for employment. *Kenez* v.
*Novelty Compact Leather Co.,* supra, 111 Conn. 232.

court from enforcing the *employer's* rights under the prohibited employment agreement. Id., 234; see *Blancato* v. *Feldspar Corp.*, supra, 203 Conn. 38–39. Seeking to ascertain the legislature's intent regarding the relevant statutes; *Kenez* v. *Novelty Compact Leather Co.*, supra, 232; the court considered the effect that construing employment agreements involving illegally employed minors as "contracts of service" would have on the public policy underlying the child labor law and concluded that giving effect to the contract would further, rather than impede, that policy. Id., 236. Observing that "[w]hatever the legal situation with reference to the employment of a minor in contravention of the [child labor] statute, *he is in fact an employee*, working for and under the direction of his employer"; (emphasis added) id.; the court concluded that the taint of illegality that had attached to the employment agreement by virtue of the child labor statute did not preclude the court from effectuating the legislature's intent with respect to the Workers' Compensation Act by construing the tainted employment agreement to be a "contract of service" and thereby bringing the claimant's claim within the jurisdictional confines of the Workers' Compensation Act. Id., 236–37.

We turn now to the merits of the respondents' claim that the illegal taint attached to the employment agreement between the respondents and the claimant by virtue of the claimant's immigration status precludes that agreement from constituting a "contract of service" under § 31-275 (9) (A) (i). Having already determined on the basis of the language and legislative history of the Workers' Compensation Act that including illegal aliens within the scope of § 31-275 (9) (A) (i) accords with the language and apparent legislative intent of that act, we turn to the question of whether effectuating that intent would contravene the public policy underlying the Immigration Reform Act.

The primary purpose of the Immigration Reform Act was to establish procedures that inhibit the employment of undocumented workers and to punish employers who knowingly offer jobs to those workers. *National Labor Relations Board* v. *A.P.R.A. Fuel Oil Buyers Group, Inc.*, supra, 134 F.3d 55–56. The goal of the Immigration Reform Act was "to reduce the incentives for employers to hire illegal aliens." Id. As the legislative history of the Workers' Compensation Act indicates, if employers who knowingly employ illegal aliens were able to avoid liability under the Workers' Compensation Act for work-related injuries sustained by those workers, there would be no reason for such employers to obtain workers' compensation coverage for undocumented workers. Conn. Joint Standing Committee Hearings, supra, p. 124. Permitting employers to avoid liability under the Workers' Compensation Act, therefore, would not only provide employers with a financial incentive to hire illegal aliens in contravention of the policy of nondiscrimination embodied in the Workers' Compensation Act; id., p. 227; it would also provide unscrupulous employers with an incentive to employ undocumented workers; id., p. 124; *Mendoza* v. *Monmouth Recycling Corp.*, supra, 288 N.J. Super. 247; *Montoya* v. *Gateway Ins. Co.*, supra, 168 N.J. Super. 104; see also *Sure-Tan, Inc.* v. *National Labor Relations Board*, supra, 467 U.S. 893; *Patel* v. *Quality Inn South*, supra, 846 F.2d 704; and thereby violate the Immigration Reform Act. We conclude, therefore, that including employment agreements between illegal aliens and their employers within the purview of "contracts of service" under § 31-275 (9) (A) (i) not only would effectuate the intent of the legislature with respect to the Workers' Compensation Act, it also would accord with, rather than contravene, the public policy Congress espoused when the Immigration Reform Act was enacted. Because construing the employment

agreement between the claimant and the respondents as a "contract of service" under § 31-275 (9) (A) (i) would not contravene the public policy implemented when the Immigration Reform Act was enacted, we also conclude that judicial enforcement of the claimant's rights under the Workers' Compensation Act cannot be said to undermine either the common-law doctrine against judicial enforcement of "illegal" contracts or the effect, if any, that doctrine may have upon the enforceability of both the claimant's and the respondents' contractual rights under their employment agreement.

In relying on the doctrine against judicial enforcement of "illegal" contracts, the respondents, in effect, urge us to recognize an exception to the Workers' Compensation Act for reasons of public policy. We, however, consistently have eschewed recognizing such exceptions, repeatedly observing that the Workers' Compensation Act " 'represents a complex and comprehensive statutory scheme balancing the rights and claims of the employer and the employee arising out of work-related personal injuries' "; *Libby* v. *Goodwin Pontiac-GMC Truck, Inc.*, 241 Conn. 170, 174, 695 A.2d 1036 (1997); *Durniak* v. *August Winter & Sons, Inc.*, 222 Conn. 775, 781, 610 A.2d 1277 (1992); and that " 'the responsibility for carving out exceptions from any one of its provisions belongs to the legislature and not to the courts.' " *Libby* v. *Goodwin Pontiac-GMC Truck, Inc.*, supra, 174–75; *Durniak* v. *August Winter & Sons, Inc.*, supra, 781; *Bouley* v. *Norwich*, supra, 222 Conn. 760; *Panaro* v. *Electrolux Corp.*, supra, 208 Conn. 605; *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 106. "Because of the statutory nature of our workers' compensation system, policy determinations as to what . . . jurisdictional limitations apply . . . *are for the legislature, not the judiciary* . . . to make." (Emphasis added.) *Discuillo* v. *Stone & Webster*, supra, 242 Conn. 577.

Moreover, there is support for the proposition that an illegal alien's immigration status does not, as a matter of public policy, preclude him from falling within the definition of "employee" in § 31-275 (9) (A) (i). We find that support in the fact that when the legislature acted to exclude illegal aliens from eligibility for unemployment compensation[15] and general assistance,[16] it took no action to amend the Workers' Compensation Act to exclude illegal aliens. We conclude, therefore, that any illegality that attached to the employment agreement between the claimant and the respondents, by virtue of the claimant's immigration status and the respondents' actions in knowingly employing an undocumented alien, does not preclude that employment agreement from constituting a "contract of service" within the meaning of § 31-275 (9) (A) (i).

Finally, we note that our conclusion that the claimant's immigration status does not preclude the claimant from meeting the jurisdictional standard of "employee" under § 31-275 (9) is consistent with the view of a majority of our sister states that "[v]iolation of a statute or commission of a crime does not affect a [workers'] compensation claim when the illegal feature of the conduct was not the causative factor in producing the injury." 2 A. Larson & L. Larson, Workers' Compensation (1997) § 35.20, p. 6-150 ("[a] very important application . . . is that illegal entry into this country does not deprive an alien of compensation rights"); see also *Cenvill Development Corp.* v. *Candelo*, 478 So. 2d 1168, 1170 (Fla. App. 1985), review denied, 488 So. 2d 67 (Fla. 1986) (illegal aliens are "employees"; employer who knowingly employed such alien estopped from asserting immigration status as defense to claim that

[15] See General Statutes § 31-227 (f); see also Public Acts 1990, No. 90-314, § 2.

[16] See General Statutes § 17b-116; see also Public Acts, Spec. Sess., May, 1992, No. 92-16, § 5.

compensable injury caused lost wages); *Gene's Harvesting* v. *Rodriguez*, 421 So. 2d 701 (Fla. App. 1982) (aliens are "employees"; nothing in statute suggests legislature intended to include legal aliens but exclude illegal aliens from definition); *Artiga* v. *M.A. Patout & Son*, 671 So. 2d 1138, 1139 (La. App. 1996) (claimant cannot be denied workers' compensation benefits because of status as illegal alien); *Mendoza* v. *Monmouth Recycling Corp.*, supra, 288 N.J. Super. 245 ("purpose, policy and mechanism of the workers' compensation scheme are entirely consistent with the availability of benefits to illegal aliens . . . employed [in violation of the Immigration Reform Act] who are injured on the job"); *Fernandez-Lopez* v. *Jose Cervino, Inc.*, 288 N.J. Super. 14, 18, 671 A.2d 1051 (1996) (statute defines employee as "all natural persons . . . who perform service for an employer . . . unless . . . expressly excluded, [undocumented aliens] self-evidently fall within . . . the definition" [citation omitted]); *In the Matter of Testa* v. *Sorrento Restaurant, Inc.*, 10 App. Div. 2d 133, 134, 197 N.Y.S.2d 560, appeal denied, 8 N.Y.2d 705, 167 N.E.2d 650 (1960); *Lang* v. *Landeros*, 918 P.2d 404, 406 (Okla App. 1996).[17]

[17] In his dissenting opinion, Justice McDonald concludes that "[p]ursuant to the Immigration and Nationality Act . . . entering into the contract [of employment] was illegal, the parties committed a criminal act by doing so, and the contract required the alien to commit a criminal act." Although the Immigration Reform Act makes it illegal for an employer knowingly to employ an undocumented alien, the act does not make it a crime for an undocumented alien to accept employment, nor does the act provide sanctions for doing so. Thus, unless the activities the claimant engaged in pursuant to her duties as a nanny and live-in housekeeper were otherwise unlawful, the employment agreement between the claimant and the respondents reasonably cannot be said to have required the claimant to commit a criminal act.

Moreover, in concluding that workers' compensation benefits provide an incentive for illegal aliens to enter this country, the dissent relies on the fact that federal law has been amended to preclude illegal aliens from receiving federal public benefits. The legislation to which the dissent refers is the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105, 2260. We agree that eligibility for

IV

The respondents next contend that the commission lacked jurisdiction over the claimant's claim for benefits because the employment agreement between the claimant and the respondents was invalidated by misrepresentations the claimant made on her employment application and, consequently, does not constitute a "contract of service" under § 31-275 (9) (A) (i). Specifically, the respondents reason that: (1) the claimant misrepresented her employment history on her application for employment with the respondents; (2) those misrepresentations render the employment agreement between the claimant and the respondents "void ab initio"; and (3) consequently, there was no "contract" and, therefore, no "contract of service" between the claimant and the respondents. Here, too, we disagree.

In essence, the respondents ask that we recognize an exception to eligibility under the Workers' Compensation Act in order to effectuate a public policy against resume fraud. This we cannot do. We reiterate that "the responsibility for carving out exceptions from any one of [the] provisions [of the Workers' Compensation Act] belongs to the legislature and not to the courts"; *Libby* v. *Goodwin Pontiac-GMC Truck, Inc.*, supra, 241 Conn. 174–75; *Durniak* v. *August Winter & Sons, Inc.*, supra, 222 Conn. 781; *Bouley* v. *Norwich*, supra, 222 Conn. 760–61; *Panaro* v. *Electrolux Corp.*, supra, 208 Conn. 605; *Mingachos* v. *CBS, Inc.*, supra, 196 Conn. 106; and that "[b]ecause of the statutory nature of our workers' compensation system, policy determinations as to what . . . jurisdictional limitations apply . . . *are for the*

public benefits such as welfare, food stamps and public housing operates as an incentive to enter or remain in this country illegally. We do not agree, however, that requiring an illegal alien who has sustained a work-related injury to forgo his right to bring a tort claim for damages against his employer and to accept, instead, workers' compensation benefits as compensatory damages for his injury provides a similar incentive.

*legislature, not the judiciary* . . . to make." (Emphasis added.) *Discuillo* v. *Stone & Webster,* supra, 242 Conn. 577. "Although we recognize that, in enacting workers' compensation law, the legislature did not intend to create " 'a general health and benefit insurance program' "; *Doe* v. *Stamford,* supra, 241 Conn. 698; *Hansen* v. *Gordon,* 221 Conn. 29, 32, 602 A.2d 560 (1992); "we do not read the act to include limitations on eligibility for compensation for which there is no statutory basis." *Doe* v. *Stamford,* supra, 698; see *Crochiere* v. *Board of Education,* 227 Conn. 333, 359, 630 A.2d 1027 (1993).

Furthermore, two provisions of the Workers' Compensation Act directly address worker fraud. General Statutes § 31-290c provides criminal and civil penalties for making a fraudulent claim for compensation benefits, and General Statutes § 31-290d establishes the workers' compensation fraud unit of the chief state's attorney's office to investigate fraudulent claims. There is nothing whatsoever in those provisions of the Workers' Compensation Act to suggest that in addition to imposing penalties upon persons who fraudulently attempt to obtain benefits, the legislature also intended to sanction workers who make misrepresentations on their employment applications. Mindful that the theme of legislative preeminence guides our construction of the Workers' Compensation Act we decline the respondents' request for recognition of a resume fraud exception to that act. Such exception must come, if at all, from the legislature.[18]

---

[18] As a practical matter, recognition of such an exception would lead to every workers' compensation claim being investigated to determine whether the claimant had made a misstatement when hired. The commissioner consequently would be required to adjudicate questions of fact in a forum that is not suited for making wide-ranging factual determinations. See General Statutes § 31-298 (commissioner not bound by rules of evidence; no formal pleadings required). The remedy potentially available to employers for resume fraud is termination of employment.

## V

The respondents further claim that the commissioner's order awarding benefits to the claimant is violative of their equal protection and due process rights under the United States and Connecticut constitutions.[19] They reason that: (1) the claimant's immigration status precludes her from obtaining lawful employment,[20] and consequently, if and when the claimant becomes able to work, she will not be able to do so; (2) because the claimant will be unable to work, the respondents will be required to continue making total disability payments to the claimant regardless of the fact that she is no longer disabled; and (3) those payments, therefore, will deprive the respondents of equal protection and due process. The respondents' argument is based, therefore, on a hypothetical factual situation.

We frequently have noted " 'the imprudence of adjudicating constitutional questions in a "factual vacuum." ' " *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 844, 633 A.2d 296 (1993); *State* v. *Floyd*, 217 Conn. 73, 78, 584 A.2d 1157 (1991); *Lehrer* v. *Davis*,

[19] The fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. . . ."

The constitution of Connecticut, article first, § 8, provides in relevant part: "No person shall . . . be deprived of life, liberty or property without due process of law . . . ."

The constitution of Connecticut, article first, § 20, as amended by articles five and twenty-one of the amendments, provides: "No person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his or her civil or political rights because of religion, race, color, ancestry, national origin, sex or physical or mental disability."

[20] At oral argument before this court, the claimant indicated that she is currently married to a United States citizen and that her immigration status no longer precludes her from obtaining the documentation necessary for lawful employment.

214 Conn. 232, 234, 571 A.2d 691 (1990); *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 75, 523 A.2d 486 (1987). "[C]onstitutional issues do not exist in a vacuum. . . . The best teaching of this Court's experience admonishes us not to entertain constitutional questions in advance of the strictest necessity. *Parker* v. *Los Angeles*, 338 U.S. 327, 333, 70 S. Ct. 161, 94 L. Ed. 144 (1949). *Moore* v. *McNamara*, 201 Conn. 16, 21, 513 A.2d 660 (1986)." (Internal quotation marks omitted.) *Statewide Grievance Committee* v. *Whitney*, supra, 844. "A party mounting a constitutional challenge to the validity of a statute must provide an adequate factual record in order to meet its burden of demonstrating the statute's adverse impact on some protected interest of its own, in its own particular case, and not merely under some hypothetical set of facts as yet unproven. . . . We do not give advisory opinions, nor do we sit as roving commissions assigned to pass judgment on the validity of legislative enactments. Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." (Internal quotation marks omitted.) *Lehrer* v. *Davis*, supra, 234–35; *International Longshoremen's & Warehousemen's Union, Local 37* v. *Boyd*, 347 U.S. 222, 224, 74 S. Ct. 447, 98 L. Ed. 650 (1954); see *Hall* v. *Gilbert & Bennett Mfg. Co.*, 241 Conn. 282, 306–307, 695 A.2d 1051 (1997).

The respondents' claim is based on future events that are speculative and hypothetical at this point, and consequently the claim does not present an "actual and existing controversy for us to adjudicate . . . ." (Internal quotation marks omitted.) *Hallas* v. *Windsor*, 212 Conn. 338, 347, 562 A.2d 499 (1989); *Murray* v. *Lopes*, 205 Conn. 27, 30, 529 A.2d 1302 (1987). In the unlikely event that the commissioner in the future orders the

respondents to make disability payments to the claimant because, although no longer totally disabled, she is unable, by virtue of her immigration status, to obtain lawful employment, the respondents may raise this claim in any appeal that is taken from the commissioner's order.[21]

## VI

The respondents' final claim is that the commissioner abused his discretion by ordering the respondents to pay a $10,000 fine to the second injury fund for failing to comply with the workers' compensation insurance and self-insurance requirements provided in § 31-284. We agree.

In determining whether the commissioner abused his discretion, we make every reasonable presumption in favor of sustaining the commissioner's action, and the manner in which his or her discretion has been exercised will not be disturbed as long as there is a reasonable basis for its exercise. See *Gelinas* v. *West Hartford*, 225 Conn. 575, 592, 626 A.2d 259 (1993); *Walton* v. *New Hartford*, 223 Conn. 155, 169–70, 612 A.2d 1153 (1992). We note that General Statutes (Rev. to 1995) § 31-288 (c) authorizes the commission to assess "a civil penalty of *not more than ten thousand dollars*" against employers who do not comply with the relevant coverage

---

[21] General Statutes § 31-315 authorizes the commissioner to retain jurisdiction over an award of workers' compensation benefits during the entire disability period and to modify such award in three situations. First, modification is permitted if "the incapacity of an injured employee has increased, decreased or ceased, or . . . the measure of dependence on account of which the compensation is paid has changed . . . ." Second, an award may be modified if "changed conditions of fact have arisen which necessitate a change of [the award]." Third, "[t]he commissioner [also has] the same power to open and modify an award as any court of the state has to open and modify a judgment of such court." General Statutes § 31-315; see *Marone* v. *Waterbury*, 244 Conn. 1, 14–16, 707 A.2d 725 (1998). Moreover, such awards are modified by way of a separate action brought in accordance with the procedures required for original workers' compensation claims; id.; and an appeal may be taken from a modified award pursuant to § 31-301.

requirements. (Emphasis added.) We do not believe, however, that the legislature intended the commissioner to impose the maximum possible penalty on an employer who, as a first offender, fails to obtain coverage for a single employee *within the first two weeks of that employee's engagement.* In the circumstances of this case, therefore, we conclude that the $10,000 penalty was excessive.

The decision of the board is affirmed with respect to the compensability of the claimant's injuries and the board's related orders; the decision of the board is reversed with respect to the order of the commissioner directing the respondents to pay a fine of $10,000 to the second injury fund, and the case is remanded to the board with direction to vacate the commissioner's order insofar as he imposed a fine of $10,000 upon the respondents and to remand the case to the commissioner for further proceedings with respect to the amount of fine, if any, to be imposed.

In this opinion NORCOTT, KATZ and PALMER, Js., concurred.

MCDONALD, J., dissenting. I do not agree that an illegal alien engaged in an illegal contract of employment is eligible for workers' compensation benefits. As the majority points out, the right to receive workers' compensation benefits arises only in an employer-employee relationship. *Kinney* v. *State*, 213 Conn. 54, 60, 566 A.2d 670 (1989). Such benefits are granted "without regard to fault" and imposed as "a form of strict liability on the employer." *Panaro* v. *Electrolux Corp.*, 208 Conn. 589, 599, 545 A.2d 1086 (1988). The employment relationship is, therefore, at the heart of workers' compensation coverage.

This case concerns an alien, the claimant, Victoria Dowling, who illegally remained in the United States and a Connecticut couple, the named respondent, Sol

Slotnik, and the respondent Diane Reverand, who, knowing her status, hired her as a live-in nanny and housekeeper. The alien claims a 1994 work-related injury and compensation. The respondents claimed no responsibility for such benefits because the claimant was an illegal alien.

Contrary to the majority, I conclude that employment benefits are an incentive for illegal immigrants to enter or remain in this country. Whatever effect requiring those hiring illegal aliens to pay workers' compensation benefits may have to discourage that practice, it cannot be disputed that our decision confers employment benefits on illegal aliens. In doing so, it obviously makes employment in this country more attractive. In 1996, Congress explicitly recognized the compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits. It then provided that illegal aliens in general are not eligible for any federal public benefits. Pub. L. 104-193, Title IV, § 400, Aug. 22, 1996, 110 Stat. 2260.

The effect of creating an incentive for the illegal immigrant to enter or remain in this country leads me to conclude that the contract of service in this case was illegal and does not give rise to workers' compensation benefits. Pursuant to the Immigration and Nationality Act,[1] 8 U.S.C. § 1101 et seq., entering into the contract was illegal, the parties committed a criminal act by doing so, and the contract required the alien to commit a criminal act.[2] The majority recognizes such an illegal contract, entered into illegally by both the illegal alien

---

[1] The Immigration and Nationality Act was amended by the Immigration Reform and Control Act of 1986, Pub. L. No. 99-103, 100 Stat. 3359 (1986).

[2] It is illegal for an illegal alien to work in the United States. See 8 C.F.R. § 274a.12 (1998). Furthermore, the Immigration and Nationality Act provides criminal penalties for aliens who remain in the United States for thirty days or longer without obtaining required documentation. 8 U.S.C. §§ 1306, 1302.

and the knowing respondents. In *Kenez* v. *Novelty Compact Leather Co.*, 111 Conn. 229, 194 A. 679 (1930), this court refused to apply the doctrine of illegal contract to deny workers' compensation benefits to a child laborer. We stated that the child was not the "real wrongdoer" when entering into the contract; id., 234; and that the child labor statute was plainly enacted for the benefit of children. Id., 233. In the present case, the circumstances are strikingly different. The Immigration and Nationality Act was passed to benefit not the illegal immigrant but to benefit our citizens and legal immigrants. By accepting unemployment benefits, the illegal alien deprives our citizens and legal immigrants of that employment opportunity. Moreover, the alien is the "real wrongdoer" creating the illegality by entering or remaining in this country illegally.

In this case, the alien is seeking to enforce her rights to benefits which, if given, will, in my view, violate an important public policy. Our decision today, in light of the Immigration and Nationality Act, does clear and manifest damage to the goal of Congress to stem the "vast tide of illegal immigration" resulting in "literally millions of undocumented aliens in the United States." *McNary* v. *Haitian Refugee Center, Inc.*, 498 U.S. 479, 481, 111 S. Ct. 888, 112 L. Ed. 2d 1005 (1991). Concentrating our fire on the employer while at the same time conferring employment benefits on the illegal alien does not support our policy of controlling our borders. It is a mystery to me how providing state mandated employment benefits to illegal aliens will discourage them from coming to our shores or remaining here.

Accordingly, I respectfully dissent.