ASYLUM COMPANY and Insurance Designers of Maryland, Petitioners,

v.

DISTRICT OF COLUMBIA DEPARTMENT OF EMPLOYMENT SERVICES, Respondent,

and

Palemon Casarrubia Gonzales, Intervenor.

No. 08–AA–1158.

District of Columbia Court of Appeals.

Argued Sept. 14, 2010.
Decided Dec. 23, 2010.

Richard W. Galiher, Jr., Chevy Chase, MD, for petitioners.

David A. Hyden, Assistant Attorney General, with whom Peter J. Nickles, Attorney General for the District of Columbia, Todd S. Kim, Solicitor General, and Donna M. Murasky, Deputy Solicitor General, were on the brief, for respondent.

Manuel Rivera, for intervenor.

Before FISHER and THOMPSON, Associate Judges, and PRYOR, Senior Judge.

THOMPSON, Associate Judge:

As the Compensation Review Board (the "CRB") wrote in its decision that petitioners have asked us to review, the issues before us "center on [claimant/intervenor's] status as an undocumented alien."[1] Petitioners, Asylum Company and Insurance Designers of Maryland (together, the "Employer"), contend that claimant/intervenor, Palemon Cassarubias Gonzales ("Claimant"), who sustained a workplace injury on June 30, 2005, is not entitled to "compensation for lost wages for temporary total disability after July 17, 2005," the date when the Employer learned of his undocumented-alien status and terminated him. The Employer asks us to hold that the CRB erred in upholding the contrary determination by a Department of Employment Services ("DOES") administrative law judge ("ALJ").

To resolve the specific questions presented by the Employer's petition, we must begin by resolving an issue that is one of first impression in this jurisdiction: whether a worker who is an undocumented alien is covered under the District of Columbia Workers' Compensation Act (the "Act").[2] This question requires us to consider (i) whether a worker who is an undocumented alien is an "employee" within the meaning of the Act, and, if so, (ii) whether, for purposes of the Act, the cause of the worker's wage loss following an incapacitating workplace injury may be considered to be the worker's physical (or mental) incapacity, rather than the provision of federal law (IRCA) that makes it unlawful for an employer in the United States who has knowledge of the worker's status to employ the worker. An additional question we must resolve is whether, if an undocumented-alien claimant is eligible to receive benefits under the Act, IRCA has the preemptive effect of precluding a workers' compensation award to such a

---

1. In this opinion, we use interchangeably the terms "undocumented alien" (the phrase the CRB used) and "unauthorized alien," the term that is used in the Immigration Reform and Control Act of 1986 ("IRCA"). IRCA generally makes it unlawful for an employer in the United States knowingly to employ an "unauthorized alien." 8 U.S.C. § 1324a (a)(1)(A) (2006). It defines the term "unauthorized alien" to mean, "with respect to the employment of an alien at a particular time, that the alien is not at that time either (A) an alien lawfully admitted for permanent residence, or (B) authorized to be so employed by this Act or by the Attorney General." *Id.* § 1324a (h)(3).

2. We must answer this fundamental question even though the Employer asserts that it does not dispute Claimant's entitlement to "certain [types of] benefits" under the Act.

claimant that is equal to the claimant's average weekly wage. And, finally, we must decide whether the record in this case supports a determination that the Employer is liable for payment of the average-weekly-wage penalty that the Act imposes for an employer's bad-faith delay in paying wage-loss benefits.

We affirm the CRB's ruling as to all but the last of these issues and therefore uphold the determination that Claimant was entitled to temporary total disability benefits for the period June 30, 2005 to January 25, 2006. As to the last issue, relating to imposition of the average-weekly-wage penalty, we reverse and remand, because the record does not support the ALJ's finding that no reason was presented for the Employer's delay in payment of benefits, and because the ALJ did not make credibility determinations or other findings to support an inference of employer bad faith. The CRB's rationale for upholding the average-weekly-wage penalty—rejection of the Employer's argument that it could not lawfully pay wage-loss benefits to Claimant—was not a sufficient basis for concluding that the Employer acted in bad faith.

## I.

On June 30, 2005, Claimant was working as a busboy and bar bus at a restaurant and bar owned by petitioner Asylum Company when he was struck in the right eye by a bottle thrown by a customer. Another employee of the establishment took Claimant to the hospital, where he was diagnosed with a dislocated lens. As described in the ALJ's compensation order, the lens of Claimant's right eye "had been dislocated outside of the visual field of the eye causing 100% total loss of vision" of the right eye. In July 2005, Claimant underwent surgery on his eye. Not until January 25, 2006, was Claimant cleared to return to work by his treating physician. During the course of his recovery, Claimant suffered eye pain, elevated eye pressure (glaucoma), and blurred vision.

In the meantime, Claimant's hospital bills, which showed his name as "Palemon Casarrubias Gonzalez," had been sent to the Employer. At the hearing before the ALJ, David Karim—an owner of the establishment where Claimant worked, whose duties included supervision as well as hiring and firing of employees—testified on behalf of the Employer. Karim explained that he was confused when he received hospital bills for services provided to "Palemon Casarrubias Gonzalez," since he knew Claimant as "Armando Casarrubias" or "Armando Casarrubias Gonzalez," the name shown on records in the Employer's personnel files. On July 17, 2005, although not yet cleared to return to work by his treating physician, Claimant returned to the establishment and asked to resume work part-time. According to Karim, it was then that the Employer learned that Claimant had obtained his job by using the name and papers of his cousin (Armando Casarrubias), and that Claimant himself was an undocumented alien.[3] Kar-

3. The "Background" section of the compensation order states that it was when Claimant was recovering that the Employer "became aware from medical bills they received for Claimant's medical treatment that he had obtained employment by using an alias." In contrast, Claimant testified that at the time he was hired, he told "the person who take[s] care of the busboys" for the Employer that he did not have a valid Social Security number. That person told Claimant to give the Social Security number of his cousin, to "get a green card with the name of Armando but with [Claimant's] picture," and to work under Armando's name. In the "Findings of Fact" section of the compensation order, the ALJ did not explicitly credit one account over the other or make a finding about whether the

im testified that he gave Claimant money (a total of $1,000) to help pay his expenses, but told Claimant that he "could not continue to employ [Claimant] because it would be illegal" because of Claimant's undocumented status. Claimant testified that he began working for another employer in February 2006.

On August 15, 2005, Claimant filed a claim for workers' compensation benefits. Although the workers' compensation statute requires an employer either to make prompt payment of wage-loss benefits or to file a timely notice controverting the worker's claim, the Employer neither began paying benefits nor filed a notice of controversion. The matter eventually went to hearing, and in an August 1, 2007 compensation order, the ALJ determined that Claimant was temporarily and totally disabled and entitled to benefits for the June 30, 2005–January 26, 2006 period. The ALJ found that Claimant's wage loss for that period was attributable to his workplace injury and that Claimant's attempt to return to work on July 17, 2005, had been against medical advice. The ALJ also found that the Employer had failed to file a timely notice of controver-

sion and had withheld payment of compensation in bad faith. Upon the finding of bad faith, the ALJ awarded Claimant wage-loss benefits in the amount of Claimant's average weekly wage ($362.66), as provided in D.C.Code § 32–1528(b) (2001).[4] The ALJ also awarded Claimant an additional ten percent as a penalty on the Employer for failure to timely file a notice of controversion,[5] as well as interest on accrued benefits. The Employer sought review by the CRB, which affirmed the compensation order in a decision dated August 22, 2008. The Employer's petition to this court followed.

## II.

Our review of administrative agency decisions is limited, and we must affirm an agency decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Providence Hosp. v. District of Columbia Dep't of Emp't Servs.*, 855 A.2d 1108, 1111 (D.C.2004). In workers' compensation cases, we review the decision of the CRB and not that of the ALJ, but "we cannot

---

Employer knew of Claimant's unauthorized status at the time he was hired.

4. D.C.Code § 32–1528(b) (2001) provides that if a court "determines that an employer or carrier has delayed the payment of any installment of compensation to an employee in bad faith, the employer shall pay to the injured employee, for the duration of the delay, the actual weekly wage of the employee for the period that the employee is eligible to receive workers' compensation benefits." By contrast, in the absence of such delay, temporary total disability benefits are equal to "66 2/3% of the employee's average weekly wages." D.C.Code § 32–1508(2) (2001).

5. *See* D.C.Code § 32–1515(b) (2001) (providing generally that "[t]he 1st installment of compensation shall become due on the 14th day after the employer has knowledge of the

job-related injury or death," and that "[t]hereafter compensation shall be paid in installments, biweekly."); *id.* § 32–1515(e) ("If any installment of compensation payable without an award is not paid within 14 days after it becomes due . . ., there shall be added to such unpaid installment an amount equal to 10% thereof, . . . unless notice is filed under subsection (d) of this section . . . ."); and *id.* § 32–1515(d) ("If the employer controverts the right to compensation he shall file with the Mayor, on or before the 14th day after he has knowledge of the alleged injury or death and its relationship to the employment, a notice in accordance with a form prescribed by the Mayor stating that the right to compensation is controverted, the name of the claimant, the name of the employer, the date of the alleged injury or death and the grounds upon which the right to compensation is controverted").

ignore the compensation order which is the subject of the Board's review." *Washington Metro. Area Transit Auth. v. District of Columbia Dep't of Emp't Servs.*, 992 A.2d 1276, 1280 (D.C.2010) (quoting *Georgetown Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 916 A.2d 149, 151 (D.C.2007)). We review the CRB's legal rulings *de novo*, recognizing that this court is "the final authority on issues of statutory construction." *Georgetown Univ. Hosp.*, 929 A.2d at 869 (citation and internal quotation marks omitted). However, "we acknowledge [the CRB's] expertise and ... responsibility for administering the Workers' Compensation Act," and thus "we ordinarily must defer to [its] reasonable interpretations of ambiguous provisions in that legislation." *Howard Univ. Hosp. v. Dep't of Emp't Servs.*, 960 A.2d 603, 606 (D.C.2008); *see also Howard Univ. Hosp. v. District of Columbia Dep't of Emp't Servs.*, 994 A.2d 375, 377 (D.C. 2010) (explaining that we defer to the CRB's interpretation of the Act "unless the interpretation is unreasonable or in contravention of the language or legislative history of the statute," and "we must sustain the agency's interpretation even if a petitioner advances another reasonable interpretation of the statute or if we might have been persuaded by the alternate interpretation had we been construing the statute in the first instance" (internal quotation marks and citation omitted)).

## III.

■ We turn first to the issue of whether unauthorized aliens may be covered at all under the District's workers' compensation statute. Although the Employer purports not to raise this underlying issue, it emphasizes that the Act's definition of "employee" makes no mention of "illegal aliens" and implies that, in concluding that coverage under the Act extends to Claimant, the CRB improperly re-wrote the Act. And, regardless of the Employer's position on the issue of coverage, resolution of this issue is a logical precursor to resolving the issues that the petition presents.

The ALJ concluded summarily that Claimant's immigration status "[had] no application to his eligibility for workers compensation benefits." The CRB addressed the issue more expansively, noting that the Act defines "employee" as *"every person,* including a minor, in the service of another under any contract of hire or apprenticeship, written or implied, in the District of Columbia." *Gonzalez v. Asylum Co.*, CRB No. 08–077, AHD No. 06–224, OWC No. 617421, 2008 DC Wrk. Comp. LEXIS 352 at *16–17 (Aug. 22, 2008) (citing D.C.Code § 32–1501(9) (2001)) (emphasis added by the CRB). The CRB also noted that while the Act "sets forth certain exceptions to the definition, ... none of them reference[s] an undocumented alien"; and that "[a]lthough the ... Council [of the District of Columbia] has amended the definition of 'employee' over the years, the legislative history reveals no legislative intent to exclude an undocumented or illegal alien from the definition of 'employee.'" [6] *Gonzalez*, 2008 DC Wrk. Comp. LEXIS 352 at *17. The CRB also took into account that "[i]n this jurisdiction, it is well-settled the Act is to be

---

**6.** The CRB cited the D.C. Council, Committee on Housing and Economic Development, Report on the District of Columbia Workers' Compensation Act of 1979, Bill 3–106 (January 29, 1980) ("Report on Bill 3–106"); D.C. Council, Committee on Housing and Economic Development, Report on the District of Columbia Workers' Compensation Equity Amendment Act of 1990, Bill 8–74 (July 6, 1990) ("Report on Bill 8–74"); and D.C. Council, Committee on Government Operations, Report on the Workers' Compensation Act of 1998, Bill 12–192 (October 29, 1998).

interpreted so as to effect its humanitarian purpose." *Id.* (citing *Vieira v. District of Columbia Dep't of Emp't Servs.*, 721 A.2d 579, 584 (D.C.1998)). The CRB concluded that "based upon the plain meaning of the language in the Act and the legislative intent, an undocumented or illegal alien is an 'employee' as defined in the Act." *Id.*

Reviewing the matter *de novo* but according due deference to the CRB's construction of the Act, we have little difficulty agreeing with the CRB's conclusion. It is consistent with the language of the Act, specifically, D.C.Code § 32–1501(9) (2001), which excepts certain specified categories of workers from the definition of "employee," [7] but otherwise sets out a broad definition that neither excludes undocumented aliens nor makes a worker's immigration status relevant. *See* Report on Bill 3–106 at 10 (referring to the legislation's "all[-]inclusive delineation of coverage").

As the CRB recognized, the Council has made repeated amendments to the definitional section of the Act, including amendments to the provision defining the term "employee." [8] Although the Council made some of these changes in the wake of a DOES decision interpreting the Act to cover undocumented aliens (*see Castano v. American Painting and Gen. Contractors, Inc.*, H & AS No. 93–115, OWC No. 221684, 1993 DC Wrk. Comp. LEXIS 10 (November 29, 1993)), it has not acted to exclude undocumented aliens from the definition of "employee." This weighs in favor of an inference that inclusion of undocumented aliens within the definition is consistent with the Council's intent. [9]

In other jurisdictions, employers contending that undocumented-alien workers fall outside the workers' compensation statute definition of "employee" have fo-

---

7. Section 32–1501(9) excepts from the definition of "employee" several categories of workers: "(A) An employee subject to the provisions of § 7902 and subchapter I of Chapter 81 of Title 5, United States Code [pertaining to federal employees]; (B) An employee subject to the provisions of subchapter XXIII of Chapter 6 of Title 1 [pertaining to employees of the District of Columbia]; (C) Any secretary, stenographer, or other person performing any services in the office of any member of Congress, or under the direction, employment, or at the request of any member of Congress; (D) An employee of a common carrier by railroad when engaged in interstate or foreign commerce or commerce solely within the District of Columbia; (E) An employee engaged in employment that is casual and not in the usual course of trade, business, occupation, or profession of the employer unless the employee is employed in domestic service in and around a private home by any employer who, during any calendar quarter in the same or the previous year, employed 1 or more household domestic workers for 240 hours or more; or (F) Any person who is a licensed real estate salesperson, or a licensed real estate broker associated with a real estate broker, if: (i) Substantially all of the salesperson's or associated broker's remuneration is derived from real estate commissions; (ii) The services of the salesperson or associated broker are performed under a written contract specifying that the salesperson or associated broker is an independent contractor; and (iii) Such contract includes a provision that the salesperson or associated broker will not be treated as an employee for federal income tax purposes."

8. *See, e.g.,* District of Columbia Workers' Compensation Act of 1979 Amendment Act of 1994, D.C. Law 10–169; 41 D.C.Reg. 5145 (1994) (excluding certain real estate sales agents and brokers from the definition of "employee") and Criminal Code and Clarifying Technical Amendments Act of 1999, D.C. Law 13–49; 46 D.C.Reg. 5153 (1999) (adding a definition of "nonscheduled benefits").

9. *Cf. United States v. Rutherford*, 442 U.S. 544, 554, 99 S.Ct. 2470, 61 L.Ed.2d 68 (1979) (reasoning that when an agency's statutory interpretation has been brought to Congress's attention, and Congress "has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned").

cused on the reference—typical in such definitions—to persons who are in the service of another "under any contract of service." *See, e.g., Dowling v. Slotnik,* 244 Conn. 781, 712 A.2d 396, 410–13 (1998). They have argued that undocumented aliens' employment contracts are illegal and unenforceable, and therefore should not bring undocumented aliens within the coverage of the statute. *Id.* Here, Employer appears to advance such an argument, since its briefs refer repeatedly to Claimant's use of "false documents to obtain employment with Asylum," a violation of IRCA.[10] *See* 8 U.S.C. § 1324c (a)(3) (prohibiting an alien from using or attempting to use "any document lawfully issued to or with respect to a person other than the possessor" for purposes of obtaining employment in the United States). We consider, therefore, whether, contrary to the CRB's conclusion, the Act must be construed to exclude from the definition of "employee" an undocumented-alien worker whose "contract of hire" is unlawful. On this point, we find persuasive the Supreme Court of Connecticut's decision in *Dowling* (an opinion on which the CRB also relied).

In *Dowling,* the Connecticut court considered the definition of "employee" in the Connecticut workers' compensation statute, which, like our Act, defines the term to include a person who works "under any contract" of hire.[11] 712 A.2d at 410–13. The court rejected an argument that the definition excludes undocumented aliens, whose contracts of employment—sometimes procured through misrepresentations, and, in any event, contrary to IRCA—should be regarded as void and unenforceable and outside the benefits of the workers' compensation statute. *Id.* at 410. The court reasoned that "it is in order to effectuate an underlying public policy, rather than to sanction a party seeking to enforce an 'illegal' contract, that courts refuse to lend assistance to those who have contributed to the illegality that taints the contract." *Id.* Therefore, the court reasoned, in determining whether to treat an employment agreement as a "contract" for purposes of the workers' compensation statute, it is necessary to consider "the effect ... on the public policy underlying the ... law," and to analyze whether "giving effect to the contract would further, rather than impede, that

---

**10.** The Employer also cites this court's opinion in *Marboah v. Ackerman,* 877 A.2d 1052, 1059 (D.C.2005), in which we explained that we would not aid plaintiff Marboah—an unauthorized alien who obtained work and filed for Virginia workers compensation benefits using another person's name and documents, and who "was ineligible under then-current Virginia law to recover workers' compensation"—"to vindicate that fraud-induced entitlement" through his suit for legal malpractice. We note that *Marboah* is only weakly analogous to this case. Unlike Marboah, Claimant applied for workers' compensation benefits in the District (where there was no explicit bar to payment of benefits to an undocumented worker) and sought benefits under his own name, and, as described above (*supra* note 3), the ALJ made no finding about whether, as Claimant testified, he utilized his cousin's documents with the knowledge and

acquiescence of one of Employer's supervisory employees.

**11.** Like our statute, the Connecticut statute's definition of "employee" does not contain language, such as that found in the workers' compensation statutes in many other jurisdictions, stating that persons are covered under the statute "whether lawfully or unlawfully employed." *See, e.g.,* VA.CODE ANN. § 65.2–101. *See generally* 3 Lex K. Larson, *Larson's Workers' Compensation Law* § 66.03[2][b] (Rev. ed. 2010) (noting that while the workers' compensation statutes in some jurisdictions explicitly cover aliens whether lawfully or unlawfully employed, "courts have found illegal aliens to be included in the definition of employees covered by the act despite the absence of any provision expressly addressing the issue").

policy." *Id.* The court observed that declining to treat contracts of employment with undocumented aliens as "contracts" within the meaning of the workers' compensation statute would provide unscrupulous employers with a financial incentive to hire undocumented workers, while "including employment agreements between illegal aliens and their employers within the purview of 'contracts of service' . . . would accord with, rather than contravene, the public policy Congress espoused when [IRCA] was enacted." *Id.* at 411. The court concluded that "judicial enforcement of the claimant's rights under the [workers' compensation statute] cannot be said to undermine . . . the common-law doctrine against judicial enforcement of 'illegal' contracts." *Id.*

The *Dowling* court also cited "the view of a majority of . . . states that violation of a statute or commission of a crime does not affect a workers' compensation claim when the illegal feature of the conduct was not the causative factor in producing the injury." *Id.* at 412 (quoting 2 A. Larson & L. Larson, *Workers' Compensation,* § 35.20 (1997)). The court recognized that to hold otherwise "would lead to every workers' compensation claim being investigated to determine whether the claimant had made a misstatement when hired" and would require the hearing office "to adjudicate questions of fact in a forum that is not suited for making wide-ranging factual determinations." *Id.* at 413 n. 18.

We adopt the *Dowling* court's reasoning in interpreting our own statute, and note that the reasoning is consistent with

DOES's longstanding interpretation that an unauthorized-alien claimant who has used false documents to obtain work does not foreclose his claim for benefits under the Act. *See Castano,* 1993 DC Wrk. Comp. LEXIS 10 at *4, *13; *Dorantes v. Component Assembly Sys., Inc.,* OHA No. 03–082, OWC No. 571430, 2003 DC Wrk. Comp. LEXIS 153, * *4–11 (May 15, 2003); *see also District of Columbia v. American Univ.,* 2 A.3d 175, 181 n. 10 (D.C.2010) (referring to the "considerable deference" ordinarily shown to agencies' longstanding interpretations of the statutes they are charged with administering).

We note in addition that the CRB's conclusion furthers the purpose of the Act to provide not only "[b]road coverage of employees" but also "[e]ncouragement of safety." Report on Bill 3–106 at 3; *see also* Report on Bill 8–74 at 4. Interpreting the Act to exclude undocumented aliens, thereby permitting employers to avoid payment of benefits to such workers, could undermine the goal of encouraging employers to foster a workplace that is safe for all workers.[12] Finally, as the CRB observed, interpreting the term "employee" in the Act to include undocumented workers is consistent with the principle that the Act is to be construed liberally to achieve its humanitarian purpose. *See Vieira,* 721 A.2d at 584. Accordingly, we hold that the CRB did not err in concluding that Claimant was entitled to coverage under the Act.

## IV.

■ The Employer contends, however, that even if Claimant was entitled to cer-

---

12. *Cf. Mendoza v. Monmouth Recycling Corp.,* 288 N.J.Super. 240, 672 A.2d 221, 225 (App. Div.1996) ("[A]n employer's immunity from payment of compensation to [undocumented aliens] might well provide a disincentive to assuring workplace safety"); *Agri Processor Co., Inc. v. NLRB,* 514 F.3d 1, 8 (D.C.Cir. 2008) (deferring to the NLRB's interpretation that the term "employee" in the National Labor Relations Act includes undocumented aliens because "[l]eaving undocumented workers without the NLRA's protections would . . . erod[e] the unity of all the employees and imped[e] effective collective bargaining") (citation and internal quotation marks omitted).

tain benefits under the Act, and to wage-loss benefits for the first few weeks after his June 30, 2005 injury, the Employer had no obligation to pay benefits as from July 17, 2005. As described above, July 17, 2005, is the date when Claimant attempted to return to work and when (according to Karim's account) the Employer terminated him upon learning for the first time of his undocumented status. From that date on, the Employer asserts, Claimant's inability to work for Employer and to obtain other work was not due to his injury, but was the result of his termination, as required by IRCA.[13] Thus, the Employer argues, the CRB erred in upholding the ALJ's finding that Claimant's wage loss between July 17, 2005, "was the direct result of his work injury." We disagree with the Employer's contentions and affirm the CRB's ruling.

■ To begin with, substantial evidence supports the conclusion that Claimant's attempt to return to his former work on July 17, 2005, was "against medical advice."[14] Claimant's treating physician, Dr. Kenyon Kramer, did not clear him to return to work until January 25, 2006, because of lens problems that Claimant continued to experience until that date.[15]

Regarding the question of which—Claimant's physical impairment, or instead his termination based on his status as an unauthorized alien—is to be regarded as the cause of Claimant's loss of wage-earning capacity for the July 17, 2005, to January 26, 2006 period, we again owe deference to the CRB's reasonable interpretation. The CRB held that the Act entitles workers who are undocumented aliens "to temporary total disability benefits for the duration of the temporary total disability, and medical benefits for so long as they would be available to a legal or documented worker." *Gonzalez*, 2008 DC Wrk. Comp. LEXIS 352 at *28. The CRB's interpretation accords with this court's decision in *Georgetown Univ. Hosp.*, 929 A.2d 865. There, the employee suffered a workplace injury on July 4, 2002, and, following her treating physician's advice, sought to return to work on a limited schedule on August 12, 2002. *Id.* at 867. The Hospital, however, would not accommodate her request to work a reduced schedule. *Id.* When the employee thereafter stayed home from work for three consecutive days rather than work the full twelve-hour shift that the Hospital demanded, the Hospital terminated her, effective August 16, 2002. *Id.* The employee's treating physician "released her for full-time work without restriction" only as of September 9, 2002. *Id.* at 868. The Hospital had contended that the employee's eligibility for wage-loss benefits relating to the July 2, 2002 injury ended when the employee was terminated on August 16, 2002, for failure to show up for work on three consecutive days. We rea-

13. IRCA makes it "unlawful for a person or other entity ... to hire, or to recruit or refer for a fee, for employment in the United States an alien knowing the alien is an unauthorized alien" and "after hiring an alien for employment ... to continue to employ the alien in the United States knowing the alien is (or has become) an unauthorized alien with respect to such employment." 8 U.S.C. § 1324a (a)(1)(A) & (2).

14. If there is substantial evidence in the record to support the CRB's determination, i.e.,

"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," we will not substitute our judgment for that of the CRB, even if there may be contrary evidence in the record. *Georgetown Univ. Hosp.*, 929 A.2d at 869.

15. Dr. Kramer opined that, three weeks after Claimant underwent eye surgery, Claimant could have returned to a desk job not requiring the use of both eyes, but the record contains no evidence that Claimant could have qualified for such a job.

soned instead that the employee's "lawful claim for worker's compensation" ended "once her physical incapacity ended." *Id.* at 872 n. 9. Thus, even though the employee was precluded from returning to her job from August 16, 2002 until September 9, 2002, because she had been fired, we regarded her continuing physical incapacity to return to the job as the effective cause of her wage loss during that period. *See also Upchurch v. District of Columbia Dep't of Emp't Servs.,* 783 A.2d 623, 627 (D.C.2001) ("This court can find no authority, from any jurisdiction or legal treatise, which would support the proposition that termination severs the causal link between injury and wage loss").

We agree with respondent DOES that, under the Act, "the fact that an employee may be unable to work for reasons beyond his injury does not affect his entitlement to benefits, as long as the injury independently causes that disability." To be sure, Claimant's termination prevented him from working for the Employer and his undocumented status prevented other employers in the United States from lawfully employing him. But it was the work-related injury to Claimant's eye, and the time required for Claimant to recover from that injury and to adjust to his impaired vision, that made him physically unable to return to comparable wage-earning *anywhere,* thereby rendering him "disabled" within the meaning of the Act.[16] The CRB did not err in upholding the ALJ's determination that the cause of Claimant's loss of wage-earning capacity from July 17, 2005, until January 26, 2006, was his work-related injury.

### V.

■ We turn next to the Employer's argument that even if Claimant was eligible under the Act to receive workers' compensation benefits, IRCA preempts application of the average-weekly-wage provisions of the Act and precluded the ALJ from requiring the Employer to pay Claimant wage-loss benefits equal to 100 percent of his average weekly wage. In a nutshell, the Employer's argument is that the compensation order effectively required the Employer to pay wages to Claimant for the disability period even though IRCA prohibited the Employer from employing Claimant upon discovery of his undocumented status. As the Employer puts it, "if Intervenor could not be rehired because of IRCA, he also could not receive any wages from Asylum, once his illegal status was discovered." The CRB, however, concluded that "IRCA does not preempt" the average-weekly-wage penalty provision of the Act or "excuse an employer[ ] [from] compliance" with a compensation order directing the employer to pay a claimant's average weekly wage for the period of the claimant's temporary total disability. *Gonzalez,* 2008 DC Wrk. Comp. LEXIS 352 at *21. We agree with the CRB.

■ A federal law can preempt state law "by express pre-emption, where statutory language reveals an explicit congressional intent to pre-empt state law." *In re Estate of Couse,* 850 A.2d 304, 308 (D.C. 2004) (internal citations and quotation marks omitted). IRCA contains an express preemption provision (entitled "Preemption"), but it is a narrowly targeted provision that "preempt[s] any State or local law imposing civil or criminal sanctions (other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment,

---

**16.** Under the Act, "disability" means "physical or mental incapacity because of injury which results in the loss of wages." D.C.Code § 32–1501(8) (2001).

unauthorized aliens." 8 U.S.C. § 1324a (a)(h) (2006). The Act's average-weekly-wage penalty provision does not establish the type of penalty described in § 1324a (a)(h). Rather, it establishes a penalty designed "to provide a serious determent [sic] against the unjustified delay of payment of compensation." Report on Bill 8–74 at 24.[17] We are not persuaded by the Employer's argument that here—where the Employer claims that it delayed payment of wage-loss benefits on the basis of its interpretation that IRCA prohibited continued payment of "wages" to an employee whom the Employer belatedly discovered to be an unauthorized alien—imposing a penalty for the delay amounts to sanctioning the Employer for having employed an undocumented alien. We conclude that IRCA did not expressly preempt the award in issue here. *Cf. Dowling,* 712 A.2d at 403 (rejecting IRCA preemption challenge to workers' compensation award since workers' compensation benefits cannot reasonably be construed as a sanction for employing an undocumented worker).

 Federal law can also preempt state law "by field pre-emption, in which federal law so thoroughly occupies a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Estate of Couse,* 850 A.2d at 308 (internal quotations omitted). Courts assume, however, that "the historic police powers of the States are not to be superseded by Federal Act unless that is the clear and manifest purpose of Congress." *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 516, 112 S.Ct. 2608, 120 L.Ed.2d 407 (1992). Workers' compensation schemes, such as the Act, represent a valid exercise of a state's police powers,

see *New York Central Railway Co. v. White,* 243 U.S. 188, 37 S.Ct. 247, 61 L.Ed. 667 (1917), and we discern no "clear and manifest purpose of Congress" in IRCA's text or legislative history to supersede them. To the contrary, the House Report on the bill that became IRCA explained that the legislation was not intended to "undermine or diminish in any way labor protections in existing law." H.R.Rep. No. 99–682, at 58 (1996), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5662. Because the Act "gives employees an efficient, no-fault means of recovery for work-related injuries," *Howard University v. Good Food Servs., Inc.,* 608 A.2d 116, 123 (D.C.1992), it is labor-protection legislation, and IRCA "gives no indication that Congress intended ... to preempt" the Act whenever it "operate[s] to benefit undocumented aliens." *Dowling,* 712 A.2d at 404.

 There may also be conflict preemption, "which applies where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objecti[ves] of Congress." *Estate of Couse,* 850 A.2d at 308. A comparison of the benefit award in issue here with the award that was at issue in *Hoffman Plastic Compounds, Inc. v. NLRB,* 535 U.S. 137, 122 S.Ct. 1275, 152 L.Ed.2d 271 (2002), helps to demonstrate why we discern no conflict preemption in this case. In *Hoffman,* the Supreme Court held that IRCA foreclosed the National Labor Relations Board (the "NLRB") from awarding "backpay," pursuant to the NLRA, to an undocumented alien who had been laid off after he supported a union-organizing campaign. 535 U.S. at 141–42, 122 S.Ct. 1275. The backpay award was for the period

17. The Council recognized that because an employer could "toll[ ] the 10% interest payment" on delayed compensation simply by controverting a claim, another penalty was needed to deter non-good-faith payment delays. *Id.*

from the date the worker was fired until the date the employer first learned of his undocumented status. *Id.* The Court reasoned that "awarding backpay to illegal aliens runs counter to policies underlying IRCA" and "condone[s] prior violations of the immigration laws." *Id.* at 140, 149, 151, 122 S.Ct. 1275.

■■■■ As courts have recognized in a variety of contexts, the purpose of backpay "is to ... place the grievant in the position that the grievant would have been absent a violation," *In re Lilly,* 173 Vt. 591, 795 A.2d 1163, 1168 (2002), and to "completely redress the economic injury the plaintiff has suffered." *Saulpaugh v. Monroe Cmty. Hosp.,* 4 F.3d 134, 145 (2d Cir.1993). For that reason, an award of back pay "should ... consist of lost salary, including anticipated raises." *Metz v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 39 F.3d 1482, 1493 n. 13 (10th Cir.1994) (citation and internal quotation marks omitted); *see also Bush v. Lucas,* 462 U.S. 367, 388, 103 S.Ct. 2404, 76 L.Ed.2d 648 (1983) (employee "had a right to full back pay, including credit for periodic within-grade or step increases and general pay raises during the relevant period, allowances, differentials, and accumulated leave"); *EEOC v. Joint Apprenticeship Comm. of the Joint Indus. Bd. of the Elec. Indus.,* 164 F.3d 89, 102 (2d Cir.1998) ("The ordinary rule ... is that the back pay award ... should include any anticipated raises, step increases, cost of living increases, and other increases necessary to make the plaintiff whole").

■■■ In contrast—and contrary to the Employer's assertion—the award in issue here is not an award of back pay, but instead is an award of wage-loss benefits. Wage-loss benefits are "predicated upon the loss of wage-earning capacity." *Logan v. District of Columbia Dep't of Emp't Servs.,* 805 A.2d 237, 242 (D.C.2002). Their purpose is to compensate a worker for inability "to earn a living ... because of a work-related injury or illness." Report on Bill 3–106, at 2; *see also id.* at 13 ("[T]here is no liability for compensation if the injured employee is capable of earning as much as he earned prior to the injury"). The Act requires a look backward, to the average weekly wage a claimant earned in the period prior to his injury, as a proxy for the loss of wage-earning capacity. *See, e.g.,* D.C.Code § 32–1511(a)(4) ("If at the time of injury wages are fixed by the day, hour, or by the output of the employee, the average weekly wage shall be computed by dividing by 26 the total wages the employee earned in the employ of the employer in the 26 consecutive calendar weeks *immediately preceding the injury.*") (italics added).[18] And, as already described, temporary total disability benefits generally are based on "66 2/3% of the employee's average weekly wages." D.C.Code § 32–1508(2) (2001). Thus, wage-loss benefits under the Act are not designed to make a worker whole for what he would have earned if he had continued working for his employer during the disability period.[19] That is so even if, because of the penalty

18. D.C.Code § 32–1511(a)(5) creates one exception (not applicable here) to the backwards-looking calculation of benefits: "If it be established that the employee, when injured, was a minor or a student ... and that under normal conditions his wages should be expected to increase during the period of disability, whether such disability be temporary, partial, or permanent in character, the fact shall be considered in arriving at his average weekly wage."

19. Moreover, unlike statutes providing for awards of back pay, the Act caps disability benefits (at "the average weekly wages of insured employees in the District of Columbia or $396.78, whichever is greater," D.C.Code § 32–1505(b)).

for an employer's bad-faith delay in paying benefits, benefits equal the employee's full average weekly wage, since even in that circumstance there is no provision for anticipated raises or step increases or the like. In short, the average-weekly-wage award here was not designed to pay Claimant what he would have earned as part of Employer's workforce from June 30, 2005 to January 26, 2006. Accordingly, unlike the back pay award in *Hoffman*, the award in this case did not conflict with IRCA by requiring the employer to pay "wages that [the undocumented worker] could not lawfully have ... earned." [20] *Hoffman*, 535 U.S. at 149, 122 S.Ct. 1275. For that reason, we agree with courts that have held that *Hoffman* does not preclude awards of workers'-compensation-type wage-loss benefits to undocumented aliens. *See* note 22 *infra*.[21]

Further, we do not believe that payment of wage-loss benefits to claimants who are undocumented aliens "stands as an obstacle to the accomplishment and execution of the full purposes and objecti[ves] of Congress" in passing IRCA. Through IRCA, Congress sought to "reduce the flow of illegal immigration into the United States by removing the employment 'magnet' that draws undocumented aliens into the country," *Montero v. INS*, 124 F.3d 381, 384 (2d Cir.1997) (citing H.R.Rep. No. 99–682(I), at 45–46, 56, *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649–50, 5660 (1986)), and to deter employment of undocumented aliens. *Hoffman*, 535 U.S. at 147, 122 S.Ct. 1275. We think it unlikely that the availability of workers' compensation benefits in the event of a debilitating work injury in the United States would significantly affect an alien worker's decision about whether to enter this country in response to the already "magnetic" force of the job market. Conversely, as many courts have concluded, denying compensation coverage to undocumented aliens "creates powerful incentives for employers to hire such individuals." 3 Lex K. Larson, *Larson's Workers' Compensation Law* § 66.03[3][c] (Rev. ed. 2010). "[S]tate courts have almost uniformly held that workers' compensation awards are not an obstacle to the accomplishment and execution of the policy and purposes of IRCA" and "have generally concluded that uniform application of workers' compensation laws best serves the interests of both federal and state law." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 244–245 (2d Cir.2006).[22]

**20.** In *Hoffman*, the Supreme Court also noted that an unauthorized alien seeking a remedy of back pay "cannot mitigate damages, a duty our cases require, ... without triggering new IRCA violations, either by tendering false documents to employers or by finding employers willing to ignore IRCA and hire illegal workers." 535 U.S. at 150–51, 122 S.Ct. 1275. By contrast, Claimant's award of temporary total disability benefits signifies that he was physically unable to work during the period of total disability; to receive those benefits, he is not required to show that during that period he sought work (that could have triggered a new IRCA violation); *cf. Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 812 N.Y.S.2d 416, 845 N.E.2d 1246, 1259 (2006) ("Mitigation of damages is not implicated when a worker's injuries are so serious that the worker is physically unable to work").

**21.** The ALJ rejected Claimant's argument that, in violation of D.C.Code § 32–1542, the Employer terminated him in retaliation for filing a workers' compensation claim, and Claimant has not asked us to review that determination. Accordingly, we need not consider whether IRCA would have preempted the remedy prescribed by § 32–1542, i.e., that "[a]ny employee so discriminated against shall be restored to his employment and shall be compensated by his employer for any loss of wages arising out of such discrimination...."

**22.** *See, e.g., Abel Verdon Constr. v. Rivera*, —— S.W.3d ——, ——, 2010 WL 4108551, *4 (Ky.

For the foregoing reasons, we reject the Employer's preemption argument and affirm the CRB's decision that IRCA did not preclude the ALJ from determining that, for each week of the total disability period, the Employer must pay wage-loss benefits to Claimant equal to his average weekly wage.

## VI.

The Employer's final argument is that even if the average-weekly-wage award was not preempted by IRCA, the CRB erred in sustaining that aspect of the compensation order, because the record does not support the ALJ's finding that the Employer delayed payment of benefits in bad faith. In upholding the ALJ's finding of bad faith, the CRB concluded that the ALJ "correctly applied ... to the facts of this case" the analytical approach that DOES established in *Bivens v. Chemed/Roto Rooter Plumbing Servs.*, CRB. No. 05–215, AHD No. 01–002B, OWC No. 560668, 2005 DC Wrk. Comp. LEXIS 397 (April 28, 2005). *Gonzalez*, 2008 DC Wrk. Comp. LEXIS 352 at *21. Under that approach, "[t]o establish a *prima facie* showing of bad faith, the injured worker must show (1) entitlement to a benefit, (2) knowledge by the employer of a claim to the entitlement, and (3) employer's failure to provide the benefit or to controvert the claimed entitlement within a reasonable time." *Gonzalez*, 2008 DC Wrk. Comp. LEXIS 352 at *10. "Once the injured worker makes this showing, the burden shifts to the employer to produce evidence indicating a good faith basis for not paying the benefits." *Id.* "Upon such production by the employer, the injured worker has the additional burden of proving the said evidence is pretextual." *Id.*

The Employer does not appear to challenge the validity of the *Bivens* test, but maintains that the ALJ failed to apply the test correctly in this case. Having correctly articulated the *Bivens* test, the ALJ found that the Employer "was aware of the claimant's injury and its relationship to his employment at the time of its occurrence," knew of Claimant's formal claim for benefits, and had "knowledge of a claim to entitlement to workers' compensation benefits by the claimant," but "failed to provide the benefit or to controvert the claimant entitlement within a reasonable time or the statutory period required for a notice of controversion to be filed." Therefore, the ALJ reasoned, the burden shifted to the Employer to "produce evi-

Ct.App. Oct. 15, 2010); *Amoah v. Mallah Management, LLC*, 57 A.D.3d 29, 866 N.Y.S.2d 797, 800 (N.Y.App.Div.2008); *Econ. Packing Co. v. Ill. Workers' Comp. Comm'n*, 387 Ill.App.3d 283, 327 Ill.Dec. 182, 901 N.E.2d 915 (2008); *Design Kitchen & Baths v. Lagos*, 388 Md. 718, 882 A.2d 817 (2005); *Coma Corp. v. Kan. Dept. of Labor*, 283 Kan. 625, 154 P.3d 1080 (2007); *Cont'l PET Techs., Inc. v. Palacias*, 269 Ga.App. 561, 604 S.E.2d 627, 630 (2004); *Correa v. Waymouth Farms, Inc.*, 664 N.W.2d 324 (Minn.2003); *Safeharbor Emp'r Servs. I, Inc. v. Cinto Velazquez*, 860 So.2d 984, 986 (Fla.Dist.Ct.App.2003); *Reinforced Earth Co. v. W.C.A.B. (Astudillo)*, 570 Pa.464, 810 A.2d 99 (2002); *see also Bollinger Shipyards Inc. v. Dir., Office of Worker's Comp. Programs*, 604 F.3d 864, 878 (5th Cir. 2010) (reasoning that "the remedy provided by the LHWCA is merely a substitute for the negligence claim that an employee could otherwise bring against his employer in tort," and that "it would not only be illogical but it would also serve no discernable purpose to accord illegal aliens the right to bring affirmative claims in tort for personal injury but deny them the right to pursue the substitutionary remedy for personal injuries sustained in the workplace."); *Larson's Workers' Compensation Law, supra*, § 66.03[3][c] ("Given that illegal aliens are entitled to access to the courts and have the ability to file both contract and tort claims, it would seem illogical to bar illegal alien workers from seeking compensation benefits long considered a substitute for damages").

dence indicating a good faith basis for not paying benefits." The ALJ then stated:

Mr. Karim testified that while he handled practically all aspects of running and operation of the employer's business, . . . he did not know what a notice of controversion was and he did not file one.

Therefore, considering the analysis in *Bivens,* there being no record or evidence anywhere as to the employer's reasons for not paying or controverting the claimant's claim for workers' compensation benefits, . . . their bad faith for non-payment may therefore be inferred. Assuming the employer declined to pay benefits to the claimant upon the same basis they gave for not rehiring claimant, that he was an undocumented worker, there is no legal basis for taking that position because while employers are legally barred from hiring undocumented workers, that has no application to their eligibility for workers compensation benefits. D.C.Code § 32–1501(9). *Dorantes v. Component Assembly Systems, Inc.,* OHA No. 03–082, owc No. 571430 (Final Compensation Order, May 15, 2003).

Considering the evidence in the record, I find that the employer's failure or delay in paying workers' compensation benefits to the claimant was in bad faith and that he is entitled to penalties pursuant to D.C.Code § 32–1528(b).

In determining whether to uphold the ALJ's finding of bad faith, the CRB discussed the meaning of "employee" under the Act (concluding that it includes workers who are undocumented aliens) and cited the decisions by DOES in two earlier cases (*Dorantes* and *Castano* ) that allowed benefits under the Act to claimants who were undocumented aliens. The CRB also discussed case law from courts in other jurisdictions and secondary authority concluding that IRCA does not bar the payment of workers' compensation benefits to unauthorized aliens. On the basis of these precedents, the CRB upheld the ALJ's determination that the Employer acted in bad faith. *Gonzalez,* 2008 DC Wrk. Comp. LEXIS 352 at \*21 ("Accordingly, the Panel rejects the [Employer's] challenge of the ALJ's finding that it acted in 'bad faith' when it delayed paying worker's compensation benefits"). The CRB added that "[a]ssuming *arguendo* the [Employer] did not pay benefits because [Claimant] was an undocumented alien, . . . [Claimant's] undocumented status did not affect the [Employer's] responsibility to pay benefits or to timely controvert [Claimant's] claim." *Id.*

The Employer contends that the CRB erred in affirming the finding of bad faith, because the ALJ did not consider the Employer's evidence of good faith and failed to shift the burden back to Claimant to show that petitioners' reasons for nonpayment were pretextual. We agree. As shown by the quoted material from the compensation order, the ALJ did not shift the burden back to Claimant because he found "no record or evidence anywhere as to the employer's reasons for not paying or else controverting the claimant's claim." In making that statement, the ALJ appears to have assumed—incorrectly in either case—that filing a notice of controversion is sufficient to negate bad faith or that failure to file a notice of controversion is sufficient by itself to demonstrate bad faith. In addition, in finding that there was no evidence in the record of a reason for the Employer's delay in paying or controverting the claim, the ALJ ignored Karim's testimony that he did not know what a notice of controversion was (an assertion that, if credited, would make it inappropriate to treat the failure to file such a notice as evidence of bad faith). In addressing the issue of bad faith failure to pay wage-loss benefits, the ALJ also did not take

into account Karim's testimony about his "confusion" and did not discuss the significance of Karim's testimony that his "understanding of the law was that [Claimant] was an illegal, and I cannot hire an illegal." [23] Nor did the ALJ assess the (undisputed) evidence about Karim having voluntarily paid Claimant $1,000.[24] Another fact that potentially was relevant to the issue of bad faith, but which the ALJ did not discuss, is Claimant's attempt to return to work on July 17, 2005—an effort that the ALJ found was contrary to medical advice, but that may be relevant to whether the Employer was aware of, or had a reason to be skeptical about, Claimant's ongoing physical incapacity.[25] At least arguably, all of this evidence was pertinent to whether the Employer acted in bad faith—i.e., to whether the Employer

effected a "delay of payment of compensation which [was] not warranted by fact, existing law, or a good faith interpretation of the law," Report on Bill 8–74 at 24, or acted with "dishonesty of . . . purpose," or made an "unreasonable and unfounded . . . refusal to provide coverage." [26] BLACK'S LAW DICTIONARY 149 (8th ed. 2004). The ALJ correctly perceived that factors such as those listed above did not excuse the Employer from the ten percent penalty for failure to pay promptly or to file a timely notice of controversion,[27] because that penalty applies without regard to bad faith. However, the factors cited above may be relevant to bad faith *vel non,* and thus to whether the Employer should be required to pay the average-weekly-wage penalty.

The CRB did not focus on the evidence cited above or on the ALJ's finding about

23. Employer appears to rely on Karim's statement as the record basis for its argument that Employer's reasoning was that "if Intervenor could not be rehired because of IRCA, he also could not receive any wages from Asylum, once his illegal status was discovered." While the ALJ may have discredited Karim's testimony, he did not so state in the compensation order (and, as to other issues, such as the date when Claimant attempted to return to work, the ALJ credited Karim's testimony over Claimant's). In addition, the ALJ did not, either explicitly or implicitly, credit Claimant's testimony that the Employer knew that he was working under his cousin's name over Karim's testimony that the Employer learned this only when Claimant attempted to return to work after sustaining his injury. The ALJ also made no finding about the testimony by Claimant and Claimant's witness Manuel Gonzales that the Employer permitted others to work at the establishment while knowing that their documents were not legal.

24. Claimant asserts that this payment was to dissuade Claimant from filing a workers' compensation claim, and thus evidenced bad faith, but the ALJ made no finding on this point.

25. The Employer also argues that the ALJ ignored the Employer's offer of a settlement payment (in the amount of "67% permanent

loss of use of Claimant's eye," amounting to $17,764.38) to Claimant in June 2006, as well as the Employer's payment of Claimant's medical bills (in April and May of 2006). However, these facts do not appear to be relevant to whether Employer acted in bad faith in delaying payment of benefits in the period immediately following Claimant's application for benefits in August 2005.

26. The Act does not define "bad faith," but DOES has relied on the Black's Law Dictionary definition of the term. *Bivens,* 2005 DC Wrk. Comp. LEXIS 6 at *17–18.

27. Indeed, as the ALJ recognized, such factors "made the filing of a notice of controversion [even] more warranted." The Employer complains that the ALJ made no finding as to when the notice of controversion should have been filed, but, as the CRB recognized, the Employer waived this claim by agreeing, in its "Employer–Insurer's Reply to Claimant's Response and Motion to Dismiss Petition for Review" (submitted to the CRB on February 5, 2008), that "[t]he . . . sanction which should have been allowed here was the penalty for failing to file a Notice of Controversion."

"there being no record or evidence anywhere as to the employer's reasons for not paying." Instead, the CRB was satisfied that rejection of the Employer's IRCA preemption argument sufficed as a basis for accepting the ALJ's determination that the Employer acted in bad faith in not paying benefits. We do not accept that logic. Heretofore, this court has not addressed the issue of the eligibility of undocumented alien workers for wage-loss benefits under the Act, and, as the Court of Appeals of Maryland has observed, the Supreme Court's opinion in *Hoffman* "provided the foundation for arguments by employers that undocumented/illegal workers are ineligible for workers' compensation benefits because such benefits are preempted or because employment contracts with such workers are illegal." *Design Kitchen & Baths*, 882 A.2d at 829. The fact that the ALJ and the CRB rejected the Employer's argument that IRCA precluded the payment of wage-loss benefits to Claimant was not a sufficient basis for holding that the Employer acted in bad faith by withholding payment of such benefits at a time when the law in this jurisdiction was unsettled.[28]

For the foregoing reasons, we conclude that on the present record, we cannot uphold the determination that the Employer is subject to the average-weekly-wage penalty. A remand is necessary, so DOES can consider all of the evidence of record that may bear on whether the Employer acted in bad faith.

## VII.

In conclusion, we uphold the CRB's decision affirming the ALJ's determination

that Claimant is entitled to an award of temporary total disability benefits for the June 30, 2005, to January 26, 2006 period. We also hold that IRCA did not preclude an order requiring the Employer to pay wage-loss benefits equal to Claimant's average weekly wage. However, we reverse that portion of the CRB's ruling sustaining the average weekly-wage award, because we conclude that the ALJ failed to consider all of the evidence of record in determining that the Employer acted in bad faith, and that rejection of the Employer's arguments centering on Claimant's undocumented status was not enough to establish bad faith. We remand for further proceedings not inconsistent with this opinion.

*So ordered.*

**28.** This is notwithstanding the fact that most courts that have ruled on the issue have held that IRCA does not bar payment of workers' compensation benefits to unauthorized aliens. *See generally* 3 Lex K. Larson, *Larson's Work-* *ers' Compensation Law* § 66.03[3][a] (Rev. ed. 2010) (explaining that courts generally have not understood IRCA's preemption of inconsistent state laws "as barring any sort of payment on behalf of injured workers").